SUPERIOR BOILER WORKS, INC.

v.

R.J. SANDERS, INC.

No. 96–414–Appeal.

Supreme Court of Rhode Island.

April 29, 1998.

Elizabeth McDonough Noonan, William Mark Russo, Providence, for Plaintiff.

William Kenneth O'Donnell, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

In this case we consider the enforceability of a seller's original estimated time for it to ship its manufactured product to a commercial buyer. More specifically, the dispositive issue is whether the seller's original estimate of a four-week shipping period should be deemed binding upon the seller (1) when the buyer's ultimate order for the goods was not released until later in the seller's season, (2) when the seller's shipment conditions materially changed in the interim, (3) when the seller's final acceptance of the buyer's order specified a longer shipping date, and (4) when the buyer failed to come forward with evidence indicating that this longer shipping date was commercially unreasonable. For the reasons discussed below, we hold that the earlier estimate did not become a part of the ultimate sales contract in this case and, therefore, it was unenforceable against the seller.

The buyer, defendant R.J. Sanders, Inc. (Sanders), appeals from a Superior Court motion justice's entry of summary judgment in favor of the seller, plaintiff Superior Boiler Works, Inc. (Superior). Superior sued Sanders for breach of contract and, alternatively, for quantum meruit in connection with Superior's delivery of three boiler units to Sanders for a purchase price of $145,827. Sanders contends that it was error to grant summary judgment to Superior. However, in opposing Superior's summary-judgment motion, Sanders failed to adduce competent evidence showing that the longer shipping date was commercially unreasonable. As a result we affirm the Superior Court's judgment and deny this appeal.

### Facts and Travel

The following facts appear from the materials submitted in support of and in opposition to Superior's motion for summary judgment. Sanders was a Rhode Island corporation engaged in the installation of large heating systems. Superior was a Kansas corporation in the business of manufacturing and selling commercial boilers. In 1990 Sanders was working on the construction of a federal prison camp in West Virginia. On March 27, 1990, in response to specifications provided by Sanders, Superior issued a proposal setting out specifications for a so-called Seminole boiler and indicating an estimated delivery time of four weeks. Language printed on the proposal stated that "[t]he specified time of delivery is approximate * * *. The indicated date of shipment is our present best estimate of the approximate date when the material should be ready for shipment, and necessarily is subject to cause or delay outside of our own management or control." The proposal also stated that any resulting contract would be governed by Kansas law. On June 5, 1990, the seller's agent, Atkinson & Lawrence, Inc. (Atkinson), wrote to Sanders, stating, "In discussing the importance of quick delivery with Superior, they indicate that they will be able to ship in four weeks and possibly three. We will review

our pricing and give you our best numbers within the next couple days."

Two days later Superior issued another proposal (second proposal) for the sale of its Seminole boilers, setting a price of approximately $156,000 for three units. This second proposal again indicated a four-week estimated shipping timeframe but retained the earlier caveat that "[t]he specified time of delivery is approximate." In addition the second proposal stated, "This proposal must be *accepted* within thirty (30) days from the date hereof, otherwise this proposal is withdrawn." (Emphasis added.) Kansas law was again to govern any ensuing agreement.

Eleven days after the second proposal, Sanders issued a purchase order (purchase order) for three Seminole boilers signed by one John Burde and dated June 18, 1990. The purchase order was date-stamped June 20, 1990, contains the price $145,000 (some $11,000 less than the second proposal), and adds the condition "All as per plans and specifications (section 15557), pending government approval." This purchase order, however, said nothing about what jurisdiction's law should govern any later dispute arising between the parties.

On June 25, 1990, Atkinson wrote to Superior, conveying that Sanders had contacted him and now wanted to substitute Industrial Combustion (IC) burners for use in the boilers instead of the Gordan–Piatt burners originally specified. Two days later Atkinson again communicated with Superior, stating that Superior should "quote a price for the boilers less burners." On June 29 Sanders issued a second purchase order (amended purchase order) requesting that Superior amend Sanders' previous purchase order by adding $867 to the purchase price to reflect the change of burner units from Gordan–Piatt to IC. This purchase-order amendment carried the notation "Date Required: 4 Weeks" but was unsigned. On July 19, over three weeks after the amended purchase order was initially issued, Atkinson returned this document for Sanders' signature. On that very same day and while acting as an agent for Superior, Atkinson submitted specifications for the boilers to the prison project's government engineers for their ap-

proval. Atkinson's communication to the government engineers contained the notation "We have received your comments on the boiler submittal. These will be acted upon."

The next day Atkinson wrote to Sanders, stating that the specifications had been submitted to the government engineers and added, "We have received your fax forwarding preliminary approval on the boilers. We will ask the factory to respond to the relocation of the control panel * * *. The system should have modulating feedwater controls and motorized valves. This change is easily made now." On July 20, the following day, the government engineers gave their final oral approval of the specifications, and Sanders released the purchase order.

Finally, on August 6, 1990, Superior issued a sales order for the three Seminole boilers (now with IC burners) for a price matching the amended purchase-order price of $145,827. However, instead of a four-week delivery schedule, Superior's August sales order indicated a shipping date of October 1, 1990. In support of its summary-judgment motion Superior submitted an affidavit of its national sales manager, Gregory Call (Call). His affidavit alleged that the longer delivery timeframe was necessary and reasonable because Superior had received a seasonal influx of other boiler orders while Sanders was changing various specifications and other details of its order during June and July. As a result, he claimed, Superior's previous estimate of a four-week delivery window was no longer feasible after Sanders released its ultimate purchase order following the government's July 20 approval of the specifications. Call also insinuated that Superior had been unable to begin manufacturing the boilers until it had received final approval from the government engineers for the various specification changes requested by Sanders. According to Call, Superior did not receive that approval until July 20, 1990.

At some point following the issuance of Superior's August 6 sales order, Sanders apparently telephoned Superior with regard to the October 1 shipping date. However, because Sanders submitted no documents, affidavits, or other competent evidence memorializing that communication, the record does

not reflect when or how this communication occurred or what was said by the participants. The record does suggest, however, that some sort of communication occurred because on September 6, 1990, Atkinson forwarded the following response to Sanders:

"John, I'm sorry to say that we cannot improve shipment on any of the boilers for the above job. Scheduled shipment remains week of 9/24. During the time that there was indecision about burner selection and other details, Superior received a large influx of orders and therefore could not meet original commitment. Delays in releasing orders this time of year carry that risk."

At this point Sanders apparently contacted the Federal Bureau of Prisons to inform it of a potential delay in the installation of the boilers. But a government-contract specialist responded to Sanders on August 28, 1990 and indicated that the Bureau of Prisons was unmoved by Sanders' problem in obtaining an earlier delivery of the boilers: "The Government's original position remains unchanged regarding the significance of a completion date. This contract was awarded to R.J. Sanders in good faith and your compliance with its terms is imperative. Corrective action on your behalf is required to comply with the projects [sic] final completion date of October 5, 1990."

Superior ultimately shipped the boilers on or about October 1 and they arrived at the West Virginia site on October 5. However, having anticipated that the boilers would not be completely installed by the government's mandated completion date of October 5, Sanders had already arranged for temporary rental boilers to be trucked to the site and hooked up to supply heat in the interim. After the arrival and installation of Superior's boilers, Sanders tendered the contract price of $145,827 in substantial part,[1] less $45,315.85 in "backcharges." Sanders claims these charges were the reasonable costs it incurred as a result of Superior's failure to meet its original contractual commitment to a four-week shipment period.

Superior thereafter filed this lawsuit, seeking the unpaid balance of the contract price and relying upon breach of contract and quantum meruit theories. In due course Superior filed a motion for summary judgment, and both sides submitted memoranda attaching the various documents to which we have previously made reference. After a hearing a Superior Court motion justice granted the motion, and judgment entered for Superior in the principal amount of $45,867 plus interest for a total judgment of $94,253.50. Sanders appealed the grant of summary judgment to this court. Following a prebriefing conference, we ordered the parties to show cause why the appeal should not be summarily decided. After hearing oral argument and reviewing the parties' memoranda, we conclude that no cause has been shown and proceed to resolve the appeal without further briefing and argument.

### Standard of Review

■ In reviewing a summary judgment, this court is bound to employ the same standard used by the trial justice. *McPhillips v. Zayre Corp.*, 582 A.2d 747, 749 (R.I.1990). Summary judgment, of course, is a drastic remedy to be granted sparingly only when a review of all pleadings, affidavits, and discovery materials properly before the court demonstrates that no issue of fact material to the determination of the lawsuit is in genuine dispute. *Id.; Mill Factors Corp. v. L.S. Building Supplies, Inc.*, 103 R.I. 675, 679, 240 A.2d 720, 722 (1968). In reviewing these materials, the motion justice should draw all reasonable inferences in favor of the nonmoving party and must refrain from weighing the evidence or passing upon issues of credibility. *Rustigian v. Celona*, 478 A.2d 187, 189 (R.I. 1984); *Kirby, Inc. v. Weiler*, 108 R.I. 423, 425, 276 A.2d 285, 286–87 (1971).

■ The movant bears an initial burden of showing that no genuine issue of material fact exists and that therefore the case need not be submitted to the finder of fact. *Palmisciano v. Burrillville Racing Association*, 603 A.2d 317, 320 (R.I.1992). In the course of satisfying this burden by submitting evidentiary materials or pointing to the absence of such items in the evidence adduced

---

1. A $500 discrepancy remains unexplained by    the parties.

by the parties, the movant cannot expect the motion justice to conduct a sua sponte review of the entire record. Rather the moving party must direct the court's attention to the specific documents, interrogatory answers, deposition testimony, admissions, or other evidence upon which the movant relies. *Nedder v. Rhode Island Hospital Trust National Bank,* 459 A.2d 960, 962 (R.I.1983). If the movant satisfies this initial burden, the nonmovant must either point to evidentiary materials already before the court or come forward with its own competent evidence showing the existence of a genuine disputed issue of material fact. *Paradis v. Zarrella,* 683 A.2d 1337, 1339 (R.I.1996); *Ludwig v. Kowal,* 419 A.2d 297, 301 (R.I.1980).

■ However, even if no genuine issue of material fact exists, the movant is not necessarily entitled to have the motion granted. The court must also determine that the movant is entitled to prevail as a matter of law on the merits of the controversy. *Alfano v. Landers,* 585 A.2d 651, 652 (R.I.1991). Thus Rule 56(c) of the Superior Court Rules of Civil Procedure states that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law." Hence, the purpose of summary judgment is issue finding, not issue determination. *Saltzman v. Atlantic Realty Co.,* 434 A.2d 1343, 1345 (R.I.1981).

**The Parties' Summary–Judgment Submissions**

In its memorandum in support of summary judgment,[2] Superior advanced two alternate arguments. First, Superior contended that it delivered the boilers on time because its October 1 delivery date was reasonable in light of industry standards and therefore satisfied the delivery terms of the agreement. However, Superior failed to articulate its position with regard to exactly when the parties entered into an enforceable contract relating to the boilers or why no precise delivery date had been agreed upon. Alternatively Superior contended that even if the four-week delivery period that it had originally proposed somehow became a term of the contract, Sanders' acquiescence to the delay in shipment operated to waive its objection to any breach by Superior.

■ In support of its motion Superior submitted the Call affidavit and attached thereto numerous documents relating to the purchase and sale of the boilers. Sanders filed a memorandum opposing the summary-judgment motion that was unaccompanied by any affidavit. However, Sanders did attach several documents relating to the boilers and to the prison-construction project.[3] Because these particular documents are important to the parties' negotiation of the boiler-purchase agreement and to the underlying federal-prison project, and because neither party objected to the Superior Court's consideration of these documents, we are satisfied they would have been competent and admis-

---

**2.** Because Sanders failed to provide this court with a transcript of the summary-judgment hearing, our review of the motion justice's grant of summary judgment is primarily addressed to the arguments and materials included in the parties' memoranda in support of and in opposition to summary judgment.

**3.** We note that unauthenticated documents merely attached to a legal memorandum are not usually "competent evidence" worthy of consideration by the court in ruling on a motion for summary judgment. Documents typically must be properly authenticated in order to qualify as admissible evidence. *See* R.I. R. Evid. 901. In connection with a summary-judgment motion, this task can be accomplished in the usual course by submitting an affidavit of a person with per-

sonal knowledge of the documents who can attest to their authenticity and qualify them as admissible evidence. Although this particular procedure was not followed by either party in this case, neither side objected to the court's consideration of the proffered documents. A party's failure to move to strike or to make some other objection to an opponent's summary-judgment submission waives that issue for purposes of any later appeal. *See* 11 *Moore's Federal Practice* § 56.14[2][c], at 56–184 (1997). Moreover, document authenticity need not be established by any particular means, *see* R.I. R. Evid. 901 advisory comm. note (a), and may be accomplished by any of the methods enumerated in Rule 901 or 902.

sible as evidence at trial. *See* R.I. R. Evid. 901(b)(4).

Sanders also backed its opposition to the motion by referring to the various documents discussed in the Call affidavit that were attached to Superior's summary-judgment memorandum. As stated above, a party opposing summary judgment need not come forward with any evidence of its own (whether in the form of discovery materials, affidavits, or other forms of evidence) if the materials submitted by the movant reveal a factual dispute or indicate that the movant is not entitled to judgment as a matter of law. However, because we conclude that Sanders failed to adduce any evidence at all with respect to a critical issue in this case, we conclude that the summary judgment was properly granted.

### Analysis

First, the constellation of business records in this case reveals no genuine issue of material fact with respect to the formation of a contract for the sale of boilers. A contract for the sale of goods between merchants[4] requires a concrete offer and a response constituting a "definite and seasonable expression of acceptance." *See* 2 William Hawkland, *Uniform Commercial Code Series* § 2–207:02, at 159–60 (1996). The offer and the acceptance must be sufficient to manifest objectively the parties' mutual assent to be bound by a contractual relationship, *see* Restatement (Second) Contracts §§ 18–19 (1981); 2 Ronald A. Anderson, *Uniform Commercial Code* § 2–207:7, at 274 (3d

ed.1982), but no particular exchange of documents is required. A contract for sale of goods may be formed in any manner sufficient to show agreement, including conduct of both parties that evidences the existence of such a contract. *See* § 6A–2–204.

Prior to adoption of the Uniform Commercial Code (UCC), the common law "mirror image rule" held that an acceptance that did not precisely parrot the terms set out in the offer was never an acceptance but a mere counteroffer. *See Stanley–Bostitch, Inc. v. Regenerative Environmental Equipment Co.*, 697 A.2d 323, 327 (R.I.1997). This rigid requirement led to an unfortunate practice whereby commercial dealings too often degenerated into a "battle of the forms" in which the merchant sending the last written communication before performance would reap the spoils of the battle by having the "last shot" at inserting favorable boilerplate terms. *See* 2 Hawkland, § 2–207:01 at 158.

Section 2–207 of the UCC, which Rhode Island has adopted largely verbatim, effects a "radical departure" from the common-law rule.[5] 2 Hawkland, § 2–207:03 at 169. Under the UCC an acceptance that evinces that party's intent to be bound operates to create a contract with respect to the terms agreed upon even though the acceptance states additional or different terms. *Stanley–Bostitch, Inc.*, 697 A.2d at 329 (holding that additional term requiring arbitration was material and therefore did not become part of the sales contract). The first question before this court, then, is whether the record discloses

---

**4.** Because both parties to this transaction dealt in goods of the type at issue here, they were merchants. *See* G.L.1956 § 6A–2–104 cmt. 2 (the term "merchants" embraces almost any business participant).

**5.** Section 6A–2–207 provides:
"**Additional terms in acceptance or confirmation.**
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(2) The additional terms are to be construed as proposals for addition to the contract. Be-

tween merchants such terms become part of the contract unless:
(a) The offer expressly limits acceptance to the terms of the offer;
(b) They materially alter it; or
(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of title 6A."

an offer and an acceptance evidencing the parties' intent to be bound contractually to a purchase and sale of three Seminole boilers. We are mindful that "[b]ecause of the prime importance of the intent of the parties * * * the issues that will arise in the application of UCC § 2–207 will typically be questions of fact except in the relatively rare instances in which the facts are such that only one conclusion could be drawn therefrom." 2 Anderson, § 2–207:20 at 281. Nonetheless, we agree with the motion justice that this case presents one of those rare instances.

■ Here a contract could have been formed in one of two ways. First, Superior's March 27 proposal could be construed as an offer for the construction and sale of three boilers, and Sanders' June 18 signed purchase order might constitute an acceptance of that offer. Alternatively Sanders' June 29 amended purchase order (signed on July 20) might be the offer that was accepted by Superior's August 6 sales order. Because the parties' actions indicate that they did not intend for the first exchange of documents to be binding upon them, and because of the number and nature of the changes that occurred in the terms referenced in the first exchange, we are of the opinion (for the reasons explained below) that no reasonable factfinder could conclude that this first exchange of documents created a contract.

Certain aspects of Superior's March 27 boiler-sale proposal do appear to bear the typical earmarks of an offer. The proposal sets out (apparently in response to an inquiry by Sanders) the type, specifications, and quantity of the goods desired, the delivery terms (approximately four weeks), and the price of approximately $156,000 for the three units. However, despite Superior's statement that "[t]his proposal must be accepted within thirty (30) days," later events proved that the parties were still in the preliminary stages of their negotiations and not yet ready to be bound. Indeed, numerous changes to the specifications ensued during the next several months. Most significantly, Sanders'

June 18 purchase order stated a materially different purchase price from the one contained in Superior's March 27 proposal. This evidence indicates that the parties had not yet settled into a contractual agreement.[6]

In contrast Sanders' amended purchase order of July 20 and Superior's August 6 response agree exactly on the specifications and on the price of the boilers. The fact that these two documents disagree on one important term—the time for delivery—does not prevent the formation of a contract under the UCC because it is apparent from their subsequent conduct that both parties intended to be bound contractually. See § 6A–2–207(1); 2 Hawkland, § 2–207:02. What becomes of the parties' conflicting positions on the shipment period (Sanders' specified four-week delivery versus Superior's stated October 1 shipping date) is a question that must be considered in light of § 6A–2–207(2), which provides as follows:

> "The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (a) The offer expressly limits acceptance to the terms of the offer;
>>
>> (b) They materially alter it; or
>>
>> (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

Much judicial and academic debate has surrounded the operation of § 2–207(2). Its provisions have been labeled an "enigmatic section of the Code," *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.,* 460 F.Supp. 163, 205 (E.D.Pa.1978), and maligned as a "murky bit of prose." *Southwest Engineering Co. v. Martin Tractor Co.,* 205 Kan. 684, 473 P.2d 18, 25 (1970); *see generally* 2 Anderson, §§ 2–207:6 and 2–207:33; 2 Hawkland, § 2–207:03. The quandary lies in how to apply the UCC's terminology when, as here, the acceptance introduces a contractual term that directly conflicts with a term

**6.** The fact that Superior's counsel represented to this court that "[t]he agreement between the parties provides that the agreement is controlled by Kansas law"—a term that could only be drawn from the proposal because it appears in no other documents in the record—does not dissuade us from this conclusion.

expressed in the offer instead of simply adding an "additional" term.

Section 6A–2–207 provides that as between merchants an additional term becomes part of the contract unless (1) the offer expressly limits acceptance to the terms of the offer (which this offer did not)—for example, by stating that its provisions are incapable of modification, (2) the new term materially alters the contract, or (3) the offeror seasonably objects to the inclusion of the additional term. Courts generally agree that a dickered term on which the parties actively take opposing stances should not generally be considered immaterial—with the result that § 6A–2–207(2)(b) is infrequently deemed applicable.[7] *See* 2 Hawkland, § 2–207:03 at 169. The problem is that § 6A–2–207(2) utterly fails to explicate the legal consequences of conflicting terms that are both material to the contract and objected to by at least one of the parties. The official comments and drafting history are at best ambiguous on this point.[8] *See* 2 Anderson, § 2–207:33 at 291; *see also Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1578–80 (10th Cir.1984) (presenting an excellent survey and discussion of the problem).

Courts have taken three divergent approaches to this question. *See Daitom, Inc.*, 741 F.2d at 1579. In brief the first approach treats "different" terms as a subgroup of "additional" terms. The result is that such different terms, when material, simply do not become part of the contract and thus the original delivery term offered by Sanders would control. *See id.* (and cases cited therein). The second approach reaches the same result by concluding that "the offeror's terms control because the offeree's different terms merely fall out [of the contract]; § 2–207(2) cannot rescue the different terms

since that subsection applies only to *additional* terms." *Id.* Finally, the third approach, aptly named the "knock-out rule," holds that the conflicting terms cancel one another, leaving a blank in the contract with respect to the unagreed-upon term that would be filled with one of the UCC's "gap-filler" provisions. *Id.* Here, the void relating to delivery time would be filled by § 6A–2–309(1), which reads, "The time for shipment or delivery * * * if * * * not agreed upon shall be a reasonable time." *Cf. Newton Tea & Spice Co. v. Narragansett Wholesale Grocery Co.*, 45 R.I. 387, 388, 123 A. 144, 145 (1924) ("[t]he order for the goods specified no time for sending them, and the plaintiff was bound to send them to the defendants within a reasonable time") (decided under pre-UCC common law).

■■■ This court has not previously considered which of these three approaches should be applied to the interpretation of Rhode Island's version of the UCC's article 2. After due consideration we conclude that both prudence and the weight of authority favor adoption of the knock-out rule as the law of this jurisdiction. *See Daitom, Inc.*, 741 F.2d at 1579 (knock-out rule is preferable approach); *Scott Brass, Inc. v. C & C Metal Products Corp.*, 473 F.Supp. 1124, 1129 (D.R.I.1979) (applying Rhode Island law and alluding somewhat obliquely to the knock-out approach); 2 Anderson, § 2–207:33 at 291 (advocating knock-out rule); *see also Pennsylvania Power & Light Co. v. Joslyn Corp.*, 1988 WL 115773, 7 U.C.C. Rep.Serv.2d 1015 (E.D.Pa.1988) (adopting *Daitom* as Pennsylvania law), *aff'd*, 875 F.2d 311 (3d Cir.1989). We note also that if Kansas law had been applicable to this case, the knock-out rule would likely control its disposition.[9] *See*

**7.** Here, the Atkinson letter of September 6, submitted by Superior, indicates that Sanders did voice some unspecified level of concern before that date sufficient to raise Atkinson's defensive hackles, but it does not show that Sanders seasonably objected to the October 1 shipping date. Nonetheless, because we assume arguendo for purposes of reviewing this grant of summary judgment that the new-delivery-date term specified in Superior's August 6 sales order materially altered the contract, it is of no import whether Sanders seasonably objected to the new delivery date.

**8.** Although § 2–207 cmt. 6 addresses conflicting forms, this comment addresses only merchant confirmations of a prior oral agreement and thus is not helpful in this type of situation. *See generally* 2 William Hawkland, *Uniform Commercial Code Series*, § 2–207:05 (1996).

**9.** Although the parties themselves acknowledged their disagreement over what law should control the disposition of this case and were afforded ample opportunity to raise and discuss this issue, both parties failed to do so in their submissions to the Superior Court and to this court. In these

Kan.Stat.Ann. § 84–2–207 Kan. cmt. 3 (1996) (noting that "[t]he majority of courts have concluded that the different terms cancel each other out, leaving the Article 2 gap fillers (if any) to provide the missing term. Kansas Comment 1983 favors this 'knock-out' doctrine, but there is no clear answer yet to this question in Kansas," and citing *Daitom*).

We conclude that this approach best promotes the UCC's aim to abrogate the criticized common-law mirror image rule and its attendant last-shot doctrine and avoids "re-enshrin[ing] the undue advantages derived solely from the fortuitous positions of when a party sent a form." *Daitom, Inc.*, 741 F.2d at 1580. Because of the UCC's gap-filling provisions, we recognize that this approach might result in the enforcement of a contract term that neither party agreed to and, in fact, in regard to which each party expressed an entirely different preference. We note in response to this concern that the offeror and the offeree both have the power to protect any term they deem critical by expressly making acceptance conditional on assent to that term. *See* § 6A–2–207 cmt. 2; *Scott Brass, Inc.*, 473 F.Supp. at 1129 (offeree not bound in circumstances in which conditional offer was met with protestation rather than assent). And as merchants, both parties should have been well aware that their dealings were subject to the UCC and to its various gap-filling provisions. In this case, because the two variant shipping-date terms cancel each other out, the amended purchase order and the August 6 sales order formed a contract that required the three boilers to be delivered within a reasonable period after August 6.

In the usual case the question of what constitutes a reasonable time under the UCC is one for the finder of fact to determine from the nature, the purpose, and the circumstances surrounding the transaction, including the parties' course of dealing, usages of trade in the pertinent industry, or the parties' course of performance. *See* § 6A–1–

204(2); 1 Anderson § 1–204:8 (generally improper to enter summary judgment on such questions). Here Superior, as the movant for summary judgment, submitted the Call affidavit. Call averred that "[b]ased upon my experience [as national sales manager for a boiler manufacturer], one of the most common causes for delayed delivery of boilers is the purchaser's failure to approve final orders early in the year since approvals received later in the year are subject to a longer shipping date." Call further alleged that a seasonal flood of orders did indeed deluge Superior in July and August such that by early August "the estimated ship date was October 1." Although Call does not specifically contend that the October 1 ship date was reasonable in light of these circumstances, that is a fair inference to be drawn from his affidavit.

In response Sanders offered absolutely no affidavit or other competent evidence concerning the reasonableness of the October 1 delivery date. Although Sanders did produce a copy of the apparent rebuff it received from the government contract officer concerning the October 5 final completion date for the prison project, it provided no competent evidence tending to show that Superior was aware of this deadline or that it knew that the Bureau of Prisons had refused to extend the project's completion date. And although another document originating from Atkinson shows that Superior was aware in early June of "the importance of quick delivery," here too there is no indication that Superior knew that "quick delivery" meant no longer than four weeks or that the boilers had to be delivered and installed before Sanders' undisclosed October 5 deadline with the Bureau of Prisons.

Thus, because Superior met its initial burden to show that it was entitled to judgment as a matter of law on undisputed facts, the burden lay on Sanders to counter this showing with contrary evidence indicating that a

circumstances, and because the choice of Rhode Island or Kansas law would likely make no difference to the outcome of this case, we proceed to resolve this appeal under the laws of this jurisdiction. *See O'Brien v. Slefkin*, 88 R.I. 264,

267, 147 A.2d 183, 184 (1958). Restatement (Second) Conflict of Law § 186 cmt. (c) (1971) (when laws of two states are identical, choice of law is unnecessary).

genuine issue of material fact existed concerning the reasonableness of the longer shipping period specified in the August 6 sales order. Because Sanders did not meet this challenge and failed to satisfy its burden as the nonmoving party, the hearing justice properly granted summary judgment in favor of Superior. *See Bourg v. Bristol Boat Co.,* 705 A.2d 969 (R.I.1998) (defendant boatbuilder's failure to adduce any competent evidence that a promissory-note obligation had been modified warranted summary judgment).

## Conclusion

For the foregoing reasons the appeal is denied, and the Superior Court's judgment is affirmed.

BOURCIER, J., did not participate.