John DOE et al.

v.

Louis E. GELINEAU et al. (Three Cases).

Joseph Roe

v.

Louis E. Gelineau et al. (Two Cases).

Shawn Gill

v.

State of Rhode Island et al.

Nos. 97–611–Appeal to 97–614–Appeal, 98–7–Appeal and 98–8–Appeal.

Supreme Court of Rhode Island.

June 11, 1999.

**44**

Timothy Conlon, Providence, for Plaintiff.

William T. Murphy, James T. Murphy, Elisabet C. Hayes, William Poore, Providence, for Defendants Louis E. Gelineau et al.

James E. Lee, Providence, for Defendants State of Rhode Island et al.

Stephen White, Warwick, Mary Hope Peterson, Providence, for Defendants Robert McIntyre et al.

Present LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

When it comes to piercing corporate veils, courts are loath to act like Vlad the Impaler.[1] Indeed, the stakes are too high for courts regularly to disregard the separate legal status of corporations. Because a corporation is an incorporeal, "artificial creature" of the law, *Cook v. American Tubing & Webbing Co.*, 28 R.I. 41, 49, 65 A. 641, 644 (1905), it constitutes "an artificial person distinct and separate from its individual and often changing stockholders." *Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 138, 164 A. 509, 510 (1933).[2] Thus, courts are not inclined to perforate a corporation's legal shell

---

[1] Vlad Tepes (the Impaler), also known as Vlad III Dracula or Dracula, ruled as the Prince of Wallachia in 1448, in 1456–1462, and in 1476 (the year in which he died). *See* 12 *Dictionary of the Middle Ages* 484 (1988). Born about 1431, "[h]is life was intimately linked with the fifteenth-century crisis in the Balkans symbolized by the Ottoman Turkish conquest of Constantinople in 1453 and its consequences." *Id.* Impalement was his preferred method of torture and execution, thus the nickname "the Impaler." To most, however, he is identified with the fictional vampire Dracula in Bram Stoker's novel published in 1897. *See id.* at 485.

[2] Black's Law Dictionary 340 (6th ed.1990) defines a "corporation" as follows:

1 "An artificial person or legal entity created by or under the authority of the laws of a state. An association of persons created by statute as a legal entity. The law treats the corporation itself as a person which can sue and be sued. The corporation is distinct from the individuals who comprise it (shareholders). The corporation survives the death of its investors, as the shares can usually be transferred. Such entity subsists as a body politic under a special denomination, which is regarded in law as having a personality and existence distinct from that of its several members, and which is, by the same authority, vested with the capacity of continuous succession, irrespective of changes in its membership, either in perpetuity or for a limited term of years, and of acting as a unit or single individual in matters relating to the common purpose of the association, within the scope of the powers and authorities conferred upon such bodies by law."

merely to stick one or more of its constituent or affiliated entities with liability for the corporation's misdeeds. Rather, respect for the legitimacy of the corporate form and its protective shield of limited liability usually dissuades courts from using their remedial swords to run them through—at least without extreme provocation to do so.

■ In these consolidated cases, plaintiffs are individuals who, as children, formerly resided at the Saint Aloysius Home, a foster-care and treatment facility for boys between the ages of five and fifteen that was operated by defendant Rhode Island Catholic Orphan Asylum Corporation d/b/a Saint Aloysius Home (St.Aloysius). The plaintiffs appeal from the Superior Court's entry of summary judgment in favor of defendant, the Roman Catholic Bishop of Providence (RCB), a corporation sole.[3] In essence, plaintiffs claim that RCB was the real corporate party in interest for various business activities conducted by or on behalf of the Roman Catholic Diocese of Providence (diocese). As a result, plaintiffs seek to hold RCB liable for certain alleged tortious acts that occurred at St. Aloysius, a diocesan agency. The claimed misconduct pertains to the physical, emotional, and sexual abuse of plaintiffs at the hands of certain former St. Aloysius employees and staff members while plaintiffs were residents of this institution. For the reasons discussed below, we affirm the Superior Court grant of summary judgment in favor of RCB, but on different grounds than those relied upon by the motion justice. In brief, we are unable to discern any evidence in the record sufficient to create a genuine issue of material fact concerning whether St. Aloysius' separate corporate identity should be disregarded in favor of holding RCB liable for the asserted wrongdoing.

## Facts and Travel

At the time of the alleged misconduct, plaintiffs were children in the care and custody of the State of Rhode Island (state), Department of Children, Youth, and Families (DCYF). The state, in turn, had placed these children at St. Aloysius, a nonprofit corporation organized pursuant to a special enactment of the General Assembly. Under a contract with DCYF, St. Aloysius agreed to provide emergency-shelter care, residential treatment, and a treatment/foster-care program for boys between the ages of five and fifteen. The plaintiffs filed complaints against numerous defendants, including officials and entities that, they alleged, were affiliated in one way or another with St. Aloysius and hence responsible for the alleged abuse.[4] The plaintiffs averred that, while they were residents at the home and under the

3. A corporation sole "is one consisting of one person only, and his successors in some particular station, who are incorporated by law in order to give them some legal capacities and advantages, particularly that of perpetuity." Black's Law Dictionary 341 (6th ed.1990). Its "successor becomes the corporation on his death or resignation, [and has been] limited in the main today to bishops and heads of dioceses." *Id.* at 342.

4. In addition to the Roman Catholic Bishop of Providence (RCB), a corporation sole, plaintiffs named the following individuals and entities as defendants in their complaints: State of Rhode Island, Department of Children, Youth, and Families (DCYF); Linda D'Amario Rossi, individually and in her capacity as the Director of DCYF; Steven Lieberman, individually and in his capacity as the Assistant Director of DCYF; Kenneth Fan-detti, individually and in his capacity as the Executive Director of DCYF; Carol Spizirri, individually and in her capacity as the Assistant Administrator of DCYF; Rhode Island Catholic Orphan Asylum Corporation d/b/a Saint Aloysius Home (St.Aloysius); Father Robert McIntyre, the Managing Director of St. Aloysius; and Bishop Louis E. Gelineau, in his capacity as the Chief Administrative and Operating Officer of the Diocese of Providence (diocese), in his capacity as the single officer of RCB, and in his capacity as the President, Treasurer, and Director of St. Aloysius. (The plaintiff Shawn Gill also the named diocese as a defendant in his complaint). The Superior Court consolidated plaintiffs' cases for pretrial management purposes. RCB is the only defendant involved in this appeal.

control of St. Aloysius' employees and staff, they suffered physical, emotional, and sexual abuse. After plaintiffs claims sparked investigations into these allegations, St. Aloysius closed in or about January 1994.

The defendant, RCB, is a corporation that was created in 1900 by a special enactment of the General Assembly entitled "An Act to Create the Roman Catholic Bishop of Providence, and His Successors, a Corporation Sole." 1900 R.I. Acts & Resolves at 133–35. Section 1 of the 1941 R.I. Acts & Resolves subjects RCB to the duties and liabilities of business corporations in general, § 1 at 449–51;[5] see also G.L.1956 chapter 1.1 of title 7 (Rhode Island Business Corporation Act), while section 2 of the act sets forth RCB's property-holding and -management functions, 1941 R.I. Acts & Resolves § 2 at 450–51.[6] At the time of the incidents in question, Bishop Louis E. Gelineau (Bishop Gelineau) was the only officer of RCB.[7] Beginning in 1972, RCB arguably expanded its operations beyond its statutorily authorized property-holding and -management functions. In addition to holding title to and managing certain church properties, it began to operate various diocesan activities, including the diocesan Priests Personnel Office, Office of Worship, Office of Communication, Building Commission, and Fiscal Office. This latter office provided accounting services to some of the corporations through which the Roman Catholic church carried on its temporal work in the diocese. RCB also paid the stipends of various diocesan officials, including the Bishop, the Vicar General, two co-chancellors of the diocese, the Finance Officer, the Vicar for Finance and Planning, and some of the personnel in these offices. It also entered into contracts with certain outside consultants to the diocese regarding its property management, as well as accounting and legal services. The Priest Personnel Office coordinated applications for the appointment of priests by Bishop Gelineau to fill certain specialized ministries, and this office also made recommendations to the Bishop regarding these ministries, although it had no authority to appoint priests.

In their complaints, plaintiffs claim that the alleged abuse which they suffered resulted in part from RCB's negligence in hiring, retaining, and supervising St. Aloysius' staff and its operations. Relying upon section 2 of the 1941 R.I. Acts & Resolves, RCB filed a summary-judgment motion, arguing that as a matter of law, it could not be held liable for the alleged tortious acts that occurred at St. Aloysius because the act limited RCB's powers and liabilities to matters concerning its holding and management of church property and

---

**5.** Section 1 of the 1941 R.I. Acts & Resolves at 449–50 provides, in pertinent part:

"The present Roman Catholic bishop of the diocese of Providence, and his successors in office, be and is hereby created a body politic and corporation sole, under the name and style of the Roman Catholic bishop of Providence, and by that name the said bishop and his successors in office shall be known and shall hereafter have succession, and shall have all the powers, rights and privileges prescribed by and shall be subject to all the duties and liabilities of section 75 of chapter 116 of the general laws of 1938 and all acts in amendment thereof and in addition thereto which are not inconsistent with this act."

**6.** Section 2 of the 1941 R.I. Acts & Resolves at 450–51 states, in relevant part:

"[RCB] shall have full power and authority to acquire, take, receive and hold by purchase, sale, gift, lease, devise, bequest or otherwise, real and personal estate * * * for the educational, charitable, religious and other church purposes * * * and to use, manage, improve, invest its said property and apply the income from the same for [its] aforesaid corporate purposes; and * * * to sell, convey, transmit, mortgage and dispose of [such property] subject to the laws of the state not inconsistent herewith."

**7.** On June 11, 1997, Reverend Robert E. Mulvee became the seventh bishop of the diocese. By virtue of his succession to that office, he became the single member and sole officer of RCB. The plaintiffs have not sought to join Bishop Mulvee as a defendant.

did not empower RCB to carry out Bishop Gelineau's ecclesiastical functions as Bishop. In other words, RCB argued, because RCB's enabling legislation did not authorize it to assign priests to ministries such as St. Aloysius or to supervise and discipline diocesan clergy like those assigned there, it could not be held liable for whatever abuse may have occurred at St. Aloysius. RCB also asserted that it could not be found liable for the alleged misconduct at St. Aloysius because, as a factual matter, RCB played no role whatsoever in the funding, operations, management, and/or supervision of St. Aloysius or its staff.

In response, plaintiffs argued that the act did not serve to insulate or immunize RCB from liability. Rather, plaintiffs contended, RCB was the corporate entity through which the diocese and its agencies, including Bishop Gelineau (in his capacity as the Roman Catholic Bishop of Providence) and St. Aloysius, did certain business with the state, including taking custody of plaintiffs when they were residents at St. Aloysius. In addition, plaintiffs referred to the allegation in their complaints that, as well as being the single member of RCB, Bishop Gelineau served as the President, Treasurer, and Director of St. Aloysius. Moreover, plaintiffs pointed out that Bishop Gelineau acted as the Chief Administrative and Operating Officer of the diocese in all actions material to their civil claims. The crux of plaintiff's position was that St. Aloysius was under the ultimate control and supervision of Bishop Gelineau, and that RCB, acting through Bishop Gelineau, so dominated St. Aloysius' finances, policies, and practices that the latter was merely an instrumentality of RCB such that the veil of St. Aloysius' separate corporate existence ought to be pierced for the purpose of imposing liability on RCB. However, in response to RCB's summary-judgment motion, plaintiffs produced no evidence that RCB ever was involved in any of the hiring, retaining, or supervising of St. Aloysius staff and its operations, let alone that it was negligent in doing so.

Following oral arguments and review of the parties' memoranda, affidavits, answers to interrogatories, deposition testimony, and other documents submitted, a Superior Court motion justice granted RCB's summary-judgment motion. In his bench decision, the motion justice adopted the legal analysis set forth in RCB's summary-judgment memorandum and incorporated by reference the reasoning in his earlier 1989 Superior Court decision, *Doe v. O'Connell*, No. 86–77, a case raising issues similar to those in the case at bar. Resting his decision primarily on the limited scope of the enumerated powers vested in RCB by the act, the motion justice concluded that RCB only could be liable for actions based upon its undertaking of its statutorily authorized property-holding and -management activities, and he stated that "there is no evidence whatsoever before the Court" that "[t]he corporation sole, in furtherance of the power conferred upon it to take[,] hold, receive by gift, purchase or devise, real estate and personal property, [is] involved in this case in any way."[8] The plaintiffs appeal from the Super. R. Civ. P. 54 judgment that entered following this decision.

### Standard of Review

When conducting our de novo review of an order granting summary judgment, this Court employs the same legal standard that the motion justice is bound to follow. *See Superior Boiler Works, Inc. v. R.J. Sanders, Inc.*, 711 A.2d 628, 631 (R.I.1998). The motion justice should grant and this Court should uphold a summary judgment "sparingly only when a review of all pleadings, affidavits, and discovery materials properly before the court demonstrates that no issue of fact material to the determination of the lawsuit is in

---

**8.** Thus, for example, plaintiffs presented no evidence indicating that, at the time of the alleged misconduct, RCB owned the real estate on which St. Aloysius was located or any of the personal property involved in its operations.

genuine dispute." *Id.* Upon examining these materials, the motion justice must draw all reasonable inferences in the favor of the nonmoving party and must refrain from weighing the evidence or passing upon issues of credibility. *See id.* Although the moving party bears the initial burden of establishing that no genuine issue of material fact exists for a finder of fact to resolve, *see Palmisciano v. Burrillville Racing Association,* 603 A.2d 317, 320 (R.I.1992), it can carry this burden successfully by submitting evidentiary materials, such as interrogatory answers, deposition testimony, admissions, or other specific documents, and/or pointing to the absence of such items in the evidence adduced by the parties. *See Superior Boiler Works, Inc.,* 711 A.2d at 631–32. If the moving party satisfies this burden, the nonmoving party then must identify any evidentiary materials already before the court and/or present its own competent evidence demonstrating that material facts remain in genuine dispute. See *id.; Paradis v. Zarrella,* 683 A.2d 1337, 1339 (R.I. 1996). But the nonmoving party "cannot rely solely on mere allegations or on the denials contained in the pleadings to defeat the motion." *Avco Corp. v. Aetna Casualty & Surety Co.,* 679 A.2d 323, 327 (R.I.1996) (quoting *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 954 (R.I.1994)). On appeal, we will affirm a summary-judgment grant if our review of the evidence reveals that no genuine disputed issue of material fact exists and that the moving party is entitled to judgment as a matter of law on the merits of the controversy. *See Rhode Island Depositors Economic Protection Corp. v. Rignanese,* 714 A.2d 1190, 1193 (R.I.1998); *Superior Boiler Works, Inc.,* 711 A.2d at 632; *Avco Corp.,* 679 A.2d at 327. Conversely, if any of these elements are absent, then we will reverse and remand the case for further proceedings.

## Analysis

The plaintiffs argue on appeal that the motion justice erred in granting summary judgment in favor of RCB because material facts remain in dispute concerning RCB's distinct corporate status and its role in the financing, management, and/or supervision of St. Aloysius' operations and staff. Specifically, they contend that a controlling, interlocking relationship exists between St. Aloysius, Bishop Gelineau, and RCB. The plaintiffs also claim that because the diocese conducts certain aspects of its business through Bishop Gelineau and/or RCB and because the diocese and Bishop Gelineau permitted St. Aloysius to hold itself out as an agency of the diocese, we should hold that RCB is potentially liable for the alleged tortious acts that occurred at St. Aloysius.

 Although the criteria for piercing the corporate veil of limited liability vary with the particular circumstances of each case, *see Miller v. Dixon Industries Corp.,* 513 A.2d 597, 604 (R.I.1986), one overriding factor is omnipresent: "the corporate entity should be disregarded and treated as an association of persons only when the facts of a particular case render it unjust and inequitable to consider the subject corporation a separate entity." *R & B Electric Co. v. Amco Construction Co.,* 471 A.2d 1351, 1354 (R.I.1984); *Vennerbeck & Clase Co.,* 53 R.I. at 138–39, 164 A. at 510. Such facts may be present, for example, "when the corporate entity 'is used to defeat public convenience, justify wrong, protect fraud, or defend crime.'"*R & B Electric Co.,* 471 A.2d at 1354 (quoting *Vennerbeck & Clase Co.,* 53 R.I. at 139, 164 A. at 510–11); *see also United Transit Co. v. Nunes,* 99 R.I. 501, 508, 209 A.2d 215, 219 (1965). When a parent-subsidiary relationship is involved, we have stated that in order to impose liability on a parent corporation for the torts of its subsidiary, "it must be demonstrated that the parent dominated the finances, policies, and practices of the subsidiary." *Miller,* 513 A.2d at 604. On the other hand, when two corporations are connected through common-stock ownership, we will respect the separateness of each entity "unless the

totality of circumstances surrounding their relationship indicates that one of the corporations 'is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct [of the other].'" *Vucci v. Meyers Brothers Parking System, Inc.*, 494 A.2d 530, 536 (R.I.1985) (quoting *United Transit Co.*, 99 R.I. at 508–09, 209 A.2d at 219); see also 1 Fletcher, *Cyclopedia of the Law of Private Corporations* § 43 at 719 (rev. ed.1999). The burden of proof in corporate-veil-piercing cases rests upon the party asking the court to disregard the corporate entity and impose liability on some other party. *See generally* 1 Fletcher, § 41.28 at 608–16 (discussing the burden of proof in these types of cases and noting that the burden usually rests upon the plaintiff to establish a basis for disregarding a corporation's separate legal identity).

▆▆▆ We are of the opinion that these above-stated principles apply to the factual situation in this case, one in which different, nonprofit corporate entities shared a common officer and/or member. Here, Bishop Gelineau served as the single member of RCB, as the ecclesiastical head of the diocese, and as the President, Treasurer, and Director of St. Aloysius. But "[t]he mere fact that a person holds an office in two corporations that may be dealing with each other and that have offices in the same building, without more, is not enough to make them identical in contemplation of law." *Stratford Credit Corp. v. Berman*, 73 R.I. 247, 252, 54 A.2d 404, 407 (1947). Likewise, the mere fact that RCB and St. Aloysius have an officer in common is not sufficient by itself to justify disregarding their separate corporate identities. *See Richfood, Inc. v. Jennings*, 255 Va. 588, 499 S.E.2d 272, 276 (1998) (" 'The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure.' "); *Landry v. St. Charles Inn, Inc.* 446 So.2d 1246, 1251 (La.Ct.App.1984) ("[C]ourts will not deprive several corporations of their distinct identities merely because those corporations have stockholders and officers in common."); *Custer Builders, Inc. v. Quaker Heritage, Inc.*, 41 A.D.2d 448, 344 N.Y.S.2d 606, 609 (1973) ("The mere fact that the two corporations were owned and operated by the same two individuals, without more, is not sufficient to justify a disregard of corporate identities."). Therefore, in addition to establishing Bishop Gelineau's involvement in both corporations, plaintiffs had to present concrete evidence that RCB, acting through Bishop Gelineau, so organized and controlled St. Aloysius' affairs that St. Aloysius was nothing more than a mere instrumentality of RCB, *see Vucci*, 494 A.2d at 536, or that St. Aloysius " '[was] used [by RCB] to defeat public convenience, justify wrong, protect fraud, or defend crime' " such that an unjust or inequitable result would arise if we were to consider St. Aloysius a separate entity from RCB, *R & B Electric Co.*, 471 A.2d at 1354. Absent such evidence, no genuine issue of material fact existed whereby plaintiffs could prevail against RCB based upon the piercing-the-corporate-veil doctrine.

Having carefully reviewed the entire record before us, we can discern no evidence of RCB's significant involvement with, let alone its exercise of dominion over, St. Aloysius. Nor does any evidence exist that, via Bishop Gelineau, RCB used St. Aloysius to perpetrate a fraud or to participate in any of the alleged wrongdoing committed by former employees and staff of St. Aloysius. In support of their allegations regarding RCB's control of St. Aloysius, plaintiffs point to the fact that defendant Father Robert McIntyre (Father McInytre), the former Managing Director of St. Aloysius, testified at his deposition that Monsignor George Frappier (Monsignor Frappier), the diocese's Vicar for Social Ministry (of which St. Aloysius was one component), acted in the name of Bishop Gelineau in deciding what to do with St. Aloysius' records upon its closing.

Father McIntyre stated that in this regard, he took direction from Monsignor Frappier. However, no indication exists in the record that Monsignor Frappier was acting on behalf of RCB or on behalf of Bishop Gelineau in his capacity as the single member and sole officer of RCB when he gave this directive. As a result, this evidence cannot be relied upon to demonstrate that RCB exercised any control over St. Aloysius during the time period at issue. Moreover, the mere fact that Bishop Gelineau, acting through Monsignor Frappier, may have participated in a decision concerning what should be done with St. Aloysius' records upon its closing is a far cry from establishing any participation by RCB in the alleged misconduct, nor is it sufficient to create any genuine factual issue concerning RCB's alleged culpability for the misconduct in question. Just as all cows are mammals but not all mammals are cows, the mere fact that Bishop Gelineau was the sole member and officer of RCB does not mean that every action taken by Bishop Gelineau was one that could be attributed to RCB. Like other individuals who are affiliated with several different corporate entities, Bishop Gelineau was capable of acting in different capacities. Here, plaintiffs adduced no evidence indicating that Bishop Gelineau was wearing his RCB hat when he took any actions concerning St. Aloysius, especially when RCB's core property-holding and - management activities were so far afield from anything having to do with the alleged wrongdoing at St. Aloysius.

The plaintiffs also produced a multi-million dollar insurance policy issued in the name of the Roman Catholic Bishop of Providence. Father McIntyre testified that the Roman Catholic Bishop of Providence maintained records regarding various insurance policies that St. Aloysius held. During the oral arguments on this appeal, RCB's counsel conceded that this insurance policy provided not only a de-fense but also liability coverage for both St. Aloysius and Bishop Gelineau (in his capacity as the Roman Catholic Bishop of Providence)[9] with respect to the claims still pending against them in this case, but he also represented that the policy had not been issued in the name of RCB, the corporation sole. Rather, it was suggested to us that, although RCB maintained a separate insurance policy providing for its liability coverage, the particular insurance policy presented to the motion justice was one that belonged to the Bishop and to the diocese and was one that provided coverage for a host of ministries within the diocese but not for RCB's liability. In any event, whether or not this particular insurance policy provides liability coverage to RCB is immaterial at this stage of the proceedings. The key fact is that plaintiffs failed to present any evidence concerning the significance of this insurance policy vis-à-vis RCB and its alleged controlling relationship over St. Aloysius. Moreover, the insurance policy by itself, without more, does not support plaintiffs' allegations that a "controlling, interlocking relationship" existed between RCB and St. Aloysius.

In addition, plaintiffs produced some of St. Aloysius' personnel policies that were issued in the name of the diocese and indicated that at one time or another, one or more diocesan offices had reviewed these policies. However, Father McIntyre's testimony at his deposition reveals that St. Aloysius had a separate personnel policy and procedure manual that governed its relationship with its employees and staff. Neither this manual nor any of the other documents that were submitted to the motion justice—such as the reports of alleged abuse at St. Aloysius—were sent to the diocese or to anyone associated with it, much less to RCB. St. Aloysius did send an annual independent financial audit to the diocesan fiscal office, as well as some

9. Based upon these representations, our understanding is that this policy provides liability coverage for these defendants in the event that either one or both of them are held liable for the negligence claims that are still pending against them in this case.

proposals for changes to its personnel manual that dealt with group benefit plans and maternity leave. Nevertheless, these facts are largely immaterial to the issue before us and do not shed any light on the question of RCB's potential liability for the tortious acts occurring at St. Aloysius.

The plaintiffs also point to the fact that Bishop Gelineau was the publisher of the *Providence Visitor*, a newspaper which holds itself out as the voice of the diocese and which documented some of Bishop Gelineau's involvement with the management of St. Aloysius. Here again, the Bishop's connection with this publication and with St. Aloysius itself is insufficient evidence of any link between the business of RCB and the business of St. Aloysius. Furthermore, it certainly does not show that RCB or St. Aloysius failed to maintain its separate corporate identity, as alleged by plaintiffs in their complaints. Moreover, plaintiffs have failed to adduce any evidence that RCB provided any financial support whatsoever to St. Aloysius. Rather, the record demonstrates that the Catholic Charity Fund furnished St. Aloysius with certain grants for capital improvements. According to the documentary evidence submitted by RCB, the programs at St. Aloysius existed because the state had entered into custodial service contracts with St. Aloysius for children that had been committed to DCYF's care. RCB was not a party to these contracts. Additionally, RCB responded in its answers to plaintiffs' interrogatories that defendant Father McInytre was employed by and paid by St. Aloysius, and not by the diocese or by RCB.

In sum, we conclude that there was and remains insufficient proof in the record that RCB, through Bishop Gelineau, has substantially participated in, much less controlled, the finances, operations, and/or management of St. Aloysius to the extent that the latter's separate corporate identity should be disregarded and liability imposed upon RCB. Nor did the evidence create a factual issue concerning whether RCB used St. Aloysius to " 'defeat public convenience, justify wrong, protect fraud, or defend crime.' " *R & B Electric Co.*, 471 A.2d at 1354. We also conclude that plaintiffs presented no evidence of "such a unity of interest * * * that the separate personalities of [Bishop Gelineau, RCB, and St. Aloysius] no longer exist in reality[, and that] [a]dherence to the principle of their separate existence would, under the circumstances, result in injustice." *Muirhead v. Fairlawn Enterprise, Inc.*, 72 R.I. 163, 172–73, 48 A.2d 414, 419 (1946); *see also Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 377 A.2d 237 (1977); *Arch Lumber Co. v. Archibald*, 88 R.I. 49, 143 A.2d 679 (1958) (illustrating situations in which the Court determined that there was insufficient evidence of injustice to justify disregarding the corporations' separate legal identities). Therefore, we affirm the Superior Courts ruling that RCB was entitled to summary judgment dismissing plaintiffs' claims against it because plaintiffs failed to meet their burden to show that material facts remained in dispute concerning the possible imposition of liability upon RCB under the corporate-veil-piercing doctrine.

In closing, we shall assume arguendo that under circumstances not present here, it might be possible for RCB to be held liable for acts beyond the scope of its corporate charter if the evidence were to indicate that RCB (acting through an agent or representative) was otherwise guilty of the type of inequitable conduct that this Court requires to pierce the corporate veil of any corporate entity. Indeed, RCB's counsel admitted during oral argument that if the evidence had shown that RCB, acting through Bishop Gelineau, had so dominated the operations of St. Aloysius that it would be inequitable to respect the latter's separate corporate identity or to enforce the business-activity limitations imposed upon RCB by its enabling act, then a court could find it liable because the act does not insulate it from this type of veil-piercing liability. There-

fore, we can assume without deciding that RCB may indeed be subject to veil-piercing liability in certain circumstances involving conduct other than its statutorily sanctioned property-holding and -management activities—if the evidence otherwise justifies such a result. Nonetheless, in the case at bar, the plaintiffs have failed to adduce the necessary proof to create a genuine issue of material fact concerning RCB's exposure to this type of disfavored, veil-piercing liability.

### Conclusion

Accordingly, for the reasons stated, we deny and dismiss the plaintiffs' appeal, affirm the summary judgment granted to RCB, and remand the papers in this case to the Superior Court for further proceedings consistent with this opinion.

Chief Justice WEISBERGER did not participate.