**REILLY FOAM CORP., Plaintiff,**

v.

**RUBBERMAID CORP., Defendant.**

No. CIV.A.01–CV–2596.

United States District Court,
E.D. Pennsylvania.

May 28, 2002.

John Speros Kokonos, John S. Kokonos & Associates, Media, PA, for plaintiff.

David R. Fine, Kirkpatrick and Lockhart, Jacqueline Jackson-De Garcia Kirkpatrick & Lockhart LLP, Harrisburg, PA, for defendant.

### MEMORANDUM AND ORDER

SCHILLER, District Judge.

## I. INTRODUCTION

A dispute between Plaintiff Reilly Foam Corporation ("Reilly Foam") and Defendant Rubbermaid Corporation ("Rubbermaid") over a contract for sponges results in the Court doing the mopping-up. Reilly Foam alleges that it contracted to supply Rubbermaid with its requirements for certain sponges for assembly into mops sold to Target stores. Reilly Foam alleges that rather than obtaining sponges solely from Reilly Foam, Rubbermaid continued to obtain sponges from another supplier and failed to make set minimum purchases. Rubbermaid denies that the contract created between the parties called for Reilly Foam to be its exclusive supplier.

Reilly Foam moved for partial summary judgment, contending the agreement and record demonstrate Rubbermaid's liability as a matter of law. Rubbermaid, in a cross-motion, argues that it had no obligation to directly purchase sponges, that Plaintiff's misrepresentation claims are barred by the economic loss and gist-of-the-action doctrines, and that its claims for promissory estoppel and restitution are pre-empted by the parties' contract. The water here is murkier than both parties believe. Plaintiff's Motion for Partial Summary Judgment is granted in part and Defendant's Motion for Summary Judgment is granted in part as explained below.

Rubbermaid has also moved for sanctions because Reilly Foam produced a supplemental expert report after this Court's scheduling deadline. As set forth below, that motion is also granted in part.

## II. BACKGROUND

Reilly Foam manufactures custom-order sponges and other foam products. Defendant Rubbermaid manufactures home products, including mops nationwide. Before its agreement with Reilly Foam, Rubbermaid obtained sponges for its mop products from a company known as Tek Pak, a competitor of Reilly Foam.

In 1997, Rubbermaid launched its "Tidal Wave Project" to introduce new and improved sponge mops into the marketplace. The new sponge mops were named for a wave pattern which would be cut into the sponges. There were to be two basic designs for the Tidal Wave mops: a butterfly sponge and a roller sponge. The butterfly sponge mop included a mechanism which folded in half like the wings of a butterfly in order to wring out water. The roller

sponge would be squeezed by a roller mechanism.

Target Stores agreed to stock cobalt blue and yellow laminate versions of the Tidal Wave sponge mop line at its stores nationwide. Rubbermaid initially sought to obtain sponges for the mops from Tek Pak. However, Tek Pak could not make timely deliveries of sponges to meet Target's needs.

Rubbermaid contacted Reilly Foam on March 4, 1999 to determine if it could fulfill Rubbermaid's need for sponges. Rubbermaid's immediate objective with Reilly Foam was to satisfy Target's current demand. Reilly Foam submitted a price quotation to Rubbermaid on March 8, 1999 for Pattern Butterfly sponges and Pattern Roller Mop sponges on an expedited basis. Reilly Foam then manufactured and delivered the sponges.

Between March 8 and March 30, the parties discussed a longer-term relationship in which Reilly Foam would supply sponges for Rubbermaid's Tidal Wave Project. But the parties now vigorously dispute what the terms of the relationship were. According to Joseph Reilly of Reilly Foam, his company was to be the exclusive supplier of Butterfly and Roller Mop sponges with a Tidal Wave design. Rubbermaid was to purchase a minimum of 300,000 Butterfly, 300,000 Roller Mop, and 300,000 yellow ester Tidal Wave sponges each year. Rubbermaid also submitted written estimates to Reilly Foam of its requirements for Butterfly and Roller Mop sponges. Reilly Foam needed to retool its equipment and to license technology from a corporation named Foamex to produce the sponges with a "tidal wave" effect carved into their bottoms. Reilly Foam expressed concern that its profits on the contract permit it to recoup its costs.

On March 26, 1999, Reilly Foam forwarded a letter to Tony Ferrante of Rubbermaid signed by Joseph Reilly. The letter read:

This letter details the proposal that we briefly spoke about last evening. This includes the two laminates that we are currently working on, the roller mop and the butterfly mop. There are other products that we are familiar with through Kendo/New Knight, which would be the brown large celled ester, the pattern yellow ester and the yellow ether and white scrubmate. All of these are priced on the ensuing quotation.

Our proposal is that Rubbermaid Cleaning Products commit to two million pieces of product under the sub-heading Other Affected Products. There would be a surcharge of $.015 per part in an effort to amortize the cost of tooling for the wave pattern. The two million products would need to be taken over a two year period. We would also require a commitment for all of the butterfly and roller mop laminates that include the Rubbermaid Cleaning Products design.

I have also spoken to Foamex and they have agreed to run their "sample" tool for the short term until the production tool is complete, which would be approximately eight weeks. Please keep in mind that this is a proprietary pattern and we would need your design should this project move forward.

Finally, we appreciate the opportunity and understand the price sensitive nature of your products. Reilly Foam Corporation has made various concession to keep this program moving forward.

Tony, after reviewing the quotation and the conditions of this letter, please respond through a letter stating Rubbermaid Cleaning Products intentions.

I look forward to your response.

/s/ Joseph G. Reilly

Joseph G. Reilly

(March 26, 1999 Letter, Def.App. at 2a). Accompanying the letter was a list of products, prices, and quantities on Reilly Foam letterhead:

### RUBBERMAID CLEANING PRODUCTS PROJECT

Quotation
3/25/99

| PRODUCT | SIZE | PRICE [1] |
|---|---|---|
| Butterfly Sponge | 1–1/4" × 2–7/8" × 9" | $.675 each |
| Roller Mop | 2–3/8" × 3–3/4" × 8–5/8" | $.625 each |

### OTHER AFFECTED PRODUCTS

| | | | |
|---|---|---|---|
| Brown Sponge | | 2–3/8" × 3–3/4" × 8–1/2" | |
| *Annual Quantity* | 340,000 Pcs. | | $.290 each |
| Yellow Ester with Wave Pattern | | 2–1/2" × 3–3/4" × 8–1/2" | |
| *Annual Quantity* | 350,000 Pcs. | | $.320 each |
| Yellow Ether to White Scrubmate | | 2–3/8" × 3–3/4" × 8–5/8" | |
| *Annual Quantity* | 300,000 Pcs. | | $.290 each |

(Def.App. at 3a).

Tony Ferrante responded by letter on March 30, 1999. The letter, addressed to "Joe" Reilly, read in relevant part:

This letter is to serve as Rubbermaid's commitment and authorization to procure tooling so that Reilly Foam will be in a position to make sponge products with Rubbermaid's patent pending Tidal Wave™ design. I understand that $.015 will be added to the cost of the sponge purchase price until we have made purchases of 2 million sponges, thereby covering the tooling cost of $30,000.

Referencing the attached quotation, our commitment is as follows:

1. Any sponge mop product produced by New Knight, Inc., on behalf of Rubbermaid Home Products, will source the sponge component from Reilly Foam. This includes the current product offering, as referenced in your quotation, as well as any future new products that New Knight will produce for us.

2. Should any cost savings arise from productivity improvements, Rubbermaid is entitled to share in those benefits.

\* \* \*

Best Regards
/s/ Tony Ferrante
Tony Ferrante
Product Manager
Rubbermaid Home Products

(Def.App. at 4a). New Knight, an independent corporation, assembled mops on behalf of Rubbermaid. Attached to his letter was Reilly Foam's price list, marked "Approved" and signed by Mr. Ferrante. Shortly thereafter, Rubbermaid supplied Reilly Foam with a forecast of how many sponges of each variety it would need.

---

**1.** The Court has attempted to reproduce the formatting of the original price quote.

Following the exchange of letters, Rubbermaid instructed New Knight to purchase sponges solely from Reilly Foam. New Knight complied and used Reilly Foam as its exclusive source of sponges until New Knight entered bankruptcy in August 2001. Rubbermaid itself made purchases of sponges listed under the "other affected products" category. At the same time, Rubbermaid continued to purchase sponges from Tek Pak for use in the Tidal Wave line of mops. Moreover, Rubbermaid did not purchase two million sponges within the two-year window which Reilly Foam sought.[2]

Reilly Foam contends that Rubbermaid has breached the contract by failing to use Reilly Foam as Rubbermaid's exclusive supplier for the Tidal Wave Project (including roller mop and butterfly mop sponges) and making purchases from Plaintiff's competitors, by failing to purchase the minimum annual quantities of sponges in the "other affected products category" set forth in the price list which Joseph Reilly sent on March 26, 1999, and by failing to purchase two million "other affected sponges" within two years with a $0.015 surcharge.

## III. DISCUSSION OF CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

The parties have now filed cross-motions for summary judgment. The standard for summary judgment does not change when parties file cross-motions. *See Southeast-* *ern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n,* 826 F.Supp. 1506, 1512 (E.D.Pa.1993)(Pollak, J.). Summary judgment must be granted if the record, when viewed in a light most favorable to the non-moving party, shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If a party bears the burden of persuasion at trial, the party must support its motion with evidence as permitted by Rule 56(c). *See Anderson v. Deluxe Homes of PA, Inc.,* 131 F.Supp.2d 637, 648 (M.D.Pa.2001). Such evidence includes pleadings, depositions, answers to interrogatories, admissions, and affidavits. *See* FED.R.CIV.P. 56(c).

### B. Choice of Law

Reilly Foam contends that Pennsylvania law applies to all claims in this action. In its briefs, Rubbermaid has relied heavily on Pennsylvania's Uniform Commercial Code, 13 PENN. CONS.STAT. ANN. § 1101 et seq. ("Pa.U.C.C."), economic loss rule, and laws of promissory estoppel and restitution. Nevertheless, it states in a footnote that Ohio law may apply. Because I ordered the parties to brief the Court on the choice of law question and Rubbermaid has not done so, I deem it to have waived any recourse to Ohio law. The parties agree that Article 2 of the Pa.U.C.C. governs the sales contract at issue.

### C. Contract Claim

Plaintiff alleges that the March 26 letter was a contractual offer, which Rubbermaid

2. Unfortunately, the record is unclear as to how many such sponges Rubbermaid actually purchased. Plaintiff's evidence suggests that Rubbermaid has only purchased 86,882 Brown Sponges, 60,485 Yellow Ester with Wave Pattern Sponges, and 3,400 Yellow Ether to White Scrubmate Sponges. The defense contends that it purchased significantly more sponges. However, both parties agree that Rubbermaid's purchases of sponges in the "other affected products" category do not approach two million pieces within the first two years and that Rubbermaid has not bought the minimum quantities stated in Joseph Reilly's March 26 correspondence.

accepted through its March 30 correspondence. Under the contract's terms, Reilly Foam became Rubbermaid's exclusive supplier of sponges for the Tidal Wave project. Rubbermaid was to purchase at minimum two million sponges of "other affected products" within two years of execution of the contract. Of the sponges in the category of "Other Affected Products," Rubbermaid was to annually purchase 340,000 Brown Sponges, 350,000 Yellow Ester Sponges with Wave Pattern, and 300,000 Yellow Ether to White Scrubmate Sponges.

Rubbermaid, in turn, argues that Reilly Foam's March 26 letter was merely a price quote and the terms contained within it are not part of the contract. Alternatively, Rubbermaid argues that the March 30 letter from Mr. Ferrante demonstrates that Rubbermaid did not accept all the terms contained in the March 26 letter, and certain key terms must be excluded under the "knockout rule."

### 1. Whether the March 26, 1999 Letter Was an Offer Within the Meaning of Pa.UCC 2206

■ The parties first dispute whether the March 26, 1999 correspondence was merely a price quote or an "offer" within the meaning of the Pa.U.C.C. The Pa. U.C.C. does not expressly define "offer," but it has been defined based on common law principles as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. 1236, 1248 (E.D.Pa.1991)(Ditter, J.); *see also* Restatement (Second) of Contracts §§ 24 (1979). Documents reflecting preliminary negotiations between the parties do not evince an enforceable contract. *See*

*ATACS Corp. v. Trans World Communs.*, 155 F.3d 659, 666 (3d Cir.1998).

■ In the U.C.C. context, courts have encountered difficulty determining whether a document that quotes a seller's prices constitutes an offer. Generally, price quotes are not considered an offer, but rather "mere invitations to enter into negotiations or to submit offers." *Bergquist*, 777 F.Supp. at 1248; *cf. Dean Foods Co. v. Brancel*, 187 F.3d 609, 619 (7th Cir. 1999)(price quote commonly deemed invitation to offer rather than offer even if directed at particular customer). The buyer's purchase order—which sets such terms as product choice, quantity, price, and terms of delivery—is usually the offer. *See Audio Visual Assocs. v. Sharp Elec. Corp.*, 210 F.3d 254, 259 (4th Cir.2000).

■ However, some price quotes are sufficiently detailed to be deemed offers, which turns a subsequent document from a buyer containing a positive response into an acceptance. *See Bergquist*, 777 F.Supp. at 1248; *see also White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190–91 (8th Cir.1999)(holding price quotation may constitute offer if sets forth sufficient detail and contract can be formed by acceptance of its terms); *Reaction Molding Techs. v. Gen. Elec. Co.*, 585 F.Supp. 1097, 1106–07 (E.D.Pa.1984)(Lord, J.)("*Reaction Molding I* ")(price quote sent in response to buyer's request supplying property, price, terms of payment and delivery terms sufficient to constitute offer); *cf. F. Schumacher & Co. v. Silver Wallpaper & Paint Co.*, 810 F.Supp. 627, 633 (E.D.Pa.1992)(Brody, J.)(refusing to consider price list as offer because lacked terms of "quantity and commitment"). What transforms a quotation into an offer cannot be neatly defined; it depends on the manifestation of intent by the seller and the "unique facts and circumstances of each case." *Rich Prods. Corp. v. Kemutec,*

*Inc.,* 66 F.Supp.2d 937, 956 (E.D.Wis.1999). As is the case with a purported offer under the common law, the seller "must intend that the contract exist upon acceptance of the offer; that is, it must reasonably appear from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract." *Bergquist,* 777 F.Supp. at 1249.

Reviewing Reilly Foam's March 26 correspondence and its treatment by Rubbermaid, both parties treated the price quote as an offer and not merely a price quote. First, the March 26 letter did not merely list price. The letter refers to itself as a "proposal" in its opening paragraph. The attached list also includes a number of specific terms including the identification of products, their quantities, the licensing of needed technology, and details for the special manufacture of the sponges. Rubbermaid treated the letter as an offer at least with respect to quantities and prices of "other affected products." Mr. Ferrante's March 30 response merely noted that the terms states on the price list were "approved" and stated in his letter that the $0.015 surcharge for the first two million sponges purchased was acceptable.

■ While it may have been desirable to include additional terms in the March 26, 1999 letter to clarify its status as an offer, contract formation depends on the manifestation of intent by the parties to be bound rather than the presence or absence of specific terms. *See ATACS Corp.,* 155

F.3d at 667. Moreover, Joseph Reilly's March 26 letter described the price list as a quotation, no such appellation is given to the letter itself. In any event, a party's description of a document as a price quote or offer is not determinative. The Court finds the March 26 correspondence contains sufficient detail and is deemed an offer as a matter of law.

**2. Effect of Different Terms in Rubbermaid's March 30 Acceptance**

■ Once Reilly Foam's March 26 letter is deemed an offer, there can be no doubt that Rubbermaid's March 30 response accepted it. *See* Pa.U.C.C. § 2207(a) (expression of acceptance operates to form contract even if it states additional or different terms).[3] However, Rubbermaid argues that even if the March 26 letter is deemed an offer, its March 30 acceptance contained a number of different terms which modified the contract under the Pa.U.C.C.'s purported "knockout rule." Reilly Foam retorts that the Court should not follow the knockout rule and permit the terms of its offer to govern. If the knockout rule does apply, it argues, Rubbermaid's acceptance did not contain any different terms.

**a. Rubbermaid's March 30 Acceptance Contains Different Terms**

■ Pointing to Mr. Ferrante's writing "approved" on the list accompanying the

---

**3.** Rubbermaid does argue that its March 30, 1999 letter was not an acceptance but a rejection and counteroffer because it constituted a conditional acceptance. However, to be deemed a rejection due to conditional acceptance, the offeree must do more than allude to preferred terms. It must make its acceptance "expressly ... conditional on assent to the additional or added terms." Pa.U.C.C. § 2207(a). In other words, it must demonstrate an unwillingness to proceed with the

transaction unless its conditions are met. *See Step–Saver Data Sys., Inc. v. Wyse Tech.,* 939 F.2d 91, 102 (3d Cir.1991); *Reaction Molding Techs., Inc. v. Gen. Elec. Co.,* 588 F.Supp. 1280, 1289 (E.D.Pa.1984)(Lord, J.)(*"Reaction Molding II"*) (strictly construing clauses claiming to make acceptance expressly conditional). Rubbermaid's March 30 letter evinces a willingness to proceed with the transaction and therefore cannot be deemed a rejection or counteroffer.

March 26 letter, Reilly Foam first contends that Rubbermaid accepted all terms on the price list in their entirety without modification. Therefore, Mr. Ferrante's "hidden intent" to impose additional or different terms should not be enforced. (Ans. of Reilly Foam Mem. in Opp. to Rubbermaid's Mot. for Summ. Judg. at 20). As a general matter, Reilly Foam is correct; undisclosed intentions cannot be considered terms of a contract. *See Ingrassia Constr. Co. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 483 (1984); *Pioneer Commercial Funding Corp. v. Am. Fin. Mortg. Corp.*, 50 Pa. D. & C. 4th 31, 70 (Ct.Com.Pl.2000).

Mr. Ferrante did not "hide" his intentions, however; he stated a number of new terms quite clearly in his letter of March 30. In particular, he attempted to do three things: restrict Rubbermaid's commitment to two million sponges, permitting Reilly Foam to recoup its tooling cost of $30,000; ensure that New Knight would purchase its sponges from Reilly Foam; and provide that Rubbermaid would share in any cost savings from productivity improvements.

Although Reilly Foam seeks to dismiss the letter as mere "correspondence" without any effect on the contract terms, the Court is bound to read both documents of March 30—Ferrante's letter and the approved list—together. Reilly Foam's March 26 correspondence specifically invited Rubbermaid to respond by letter. It would be incongruous for Reilly Foam to now ignore that letter after Rubbermaid complied with its instructions. As part of the contract, the documents should be read as a whole, with the aim of construing conflicting clauses together, if possible. *See Brown v. Cooke*, 707 A.2d 231, 233 (Pa.Super.Ct.1998); *Bickings v. Bethlehem Lukens Plate*, 82 F.Supp.2d 402, 405 (E.D.Pa.2000)(Brody, J.).

Reilly Foam notes that, in part, Mr. Ferrante has accepted and concluded purchase contracts with a mere notation of approval on a price quote. Thus, he should be deemed to have approved and accepted Reilly Foam's offer. The Court need not speculate as to Mr. Ferrante's intentions based solely on the single word "approved" on a price list in other cases or the instant one. Mr. Ferrante's letter expresses an intent to impose new terms on the contract.

### b. Terms of the Contract

If Reilly Foam's March 26 letter operates as an offer and Rubbermaid's March 30 correspondence acts as an acceptance, the Court is left with the task of determining the terms of the agreement between these merchants under Pa.U.C.C. § 2207, commonly called the "Battle of the Forms" provision.

### i. Section 2207

Frequently, businessmen do not set forth all of the terms of their agreements in a single, comprehensive document. Rather, deals are made on the basis of conversations and letters exchanged between the parties. Ultimately, one party reduces the terms of a proposed deal to writing, which is deemed an offer. Under the common law, a document qualifying as an offer could only be "accepted" by a second document expressing acceptance on terms identical to the offer. *See Slaymaker v. Irwin*, 4 Whart. 369, 380–81, 1839 WL 3734 (Pa.1839); *Joseph v. Richardson*, 2 Pa.Super. 208, 212–14, 1896 WL 4330 (Pa.Super.Ct.1896).

The rule changed with the enactment of the Battle of the Forms provision of the Pa.U.C.C., which permits an expression of acceptance to operate as an acceptance even if it contains *additional* or *different* terms. See Pa.U.C.C. § 2207(a). The *ad-*

*ditional* terms become part of the contract unless: (1) the offer expressly limits acceptance to the terms of the offer; (2) the inserted term materially alters the offer; or (3) notification of objection to the inserted terms has been given or is given within a reasonable time. Pa.U.C.C. § 2207(b)(1)-(3).[4]

The fate of *different* terms is less clear. Section 2207(b) does not directly address different terms in an acceptance, and the question remains: if the offer is accepted on different terms, should the terms of the offer control or should the acceptance be followed, or should the conflicting terms cancel each other out, to be replaced by gap fillers provided by the U.C.C.? The question has divided courts and scholars.

One approach considers any expression of acceptance with differing terms as actually a rejection and counter-offer. Thus, the terms outlined in the acceptance would govern. *See Roto–Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir.1962), *overruled by Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 187 (1st Cir.1997). This view has been widely discredited as a revival of the common law rule, and the Court is not aware of any jurisdiction in which it is currently in force.

The minority view permits the terms of the offer to control. Because there is no rational distinction between additional terms and different terms, both are handled under § 2207(b). For support, advocates of this position point to Official Comment 3: "Whether or not *additional or*

*different* terms will become part of the agreement depends upon the provisions of subsection [b]." *See Steiner v. Mobil Oil Corp.*, 20 Cal.3d 90, 141 Cal.Rptr. 157, 569 P.2d 751, 759–60 n. 5 (Cal.1977); *Boese–Hilburn Co. v. Dean Mach. Co.*, 616 S.W.2d 520, 527 (Mo.Ct.App.1981); *see also Mead Corp. v. McNally–Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1204 & n. 11 (6th Cir.1981) (implicitly assuming, without holding, that different terms in acceptance would be subject to analysis under Ohio's version of § 2207(b)).[5] Professor Summers, the leading advocate of the minority rule, reasons that offerors have more reason to expect that the terms of their offer will be enforced than the recipient of an offer can hope that its inserted terms will be effective. *See* James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 1–3 at 35 (5th ed.2000). The offeree at least had the opportunity to review the offer and object to its contents; if the recipient of an offer objected to a term, it should not have proceeded with the contract. *See id.* Following this approach, Reilly Foam urges that the terms of its March 26, 1999 letter and price list, as the offer, would control. Because each of Rubbermaid's new terms posed material alterations to the parties contract, they would have no effect.

The final approach, held by a majority of courts, is now known as the "knockout rule." Under this approach, terms of the contract include those upon which the parties agreed and gap fillers provided by the U.C.C. provisions. This approach recog-

---

4. For the sake of consistency, all citations to the U.C.C. use Pennsylvania's format. Section 2207 is the equivalent of § 2–207 in the original version promulgated by the American Law Institute and the National Conference of Commissioners of Uniform States Laws. Section 2207(b) corresponds to § 2–207(2).

5. Judge Posner, speaking for himself, has advocated a similar rule: that the terms of the offer prevail over different terms set forth in the acceptance only if the different terms do not materially alter the contract. *See Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1178 (7th Cir.1994). However, as noted below, he predicted that Illinois would adopt the knockout rule.

nizes the fundamental tenet behind U.C.C. § 2207: to repudiate the "mirror-image" rule of the common law. One should not be able to dictate the terms of the contract merely because one sent the offer. Indeed, the knockout rule recognizes that merchants are frequently willing to proceed with a transaction even though all terms have not been assented to. It would be inequitable to lend greater force to one party's preferred terms than the other's. As one court recently explained, "An approach other than the knock-out rule for conflicting terms would result in ... [ ] any offeror ... [ ] always prevailing on its terms solely because it sent the first form. That is not a desirable result, particularly when the parties have not negotiated for the challenged clause." *Richardson v. Union Carbide Indus. Gases, Inc.,* 347 N.J.Super. 524, 790 A.2d 962, 968 (N.J.Super.Ct.App.Div.2002). Support for this view is also found in the Official U.C.C. Comments:

> Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection [b] is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection [b].

U.C.C. § 2207 cmt. 6. Advocates of the knockout rule interpret Comment 6 to require the cancellation of terms in both parties' documents that conflict with one another, whether the terms are in confirmation notices or in the offer and acceptance themselves. A majority of courts now favor this approach. *See JOM, Inc. v. Adell Plastics, Inc.,* 193 F.3d 47, 54 (1st Cir.1999) (ascribing knockout rule to law of Maine and Maryland); *Ionics v. Elmwood Sensors, Inc.,* 110 F.3d 184, 189 (1st Cir. 1997) (applying Massachusetts law); *Northrop Corp. v. Litronic Indus.,* 29 F.3d 1173, 1178 (7th Cir.1994)(describing this approach as "majority rule" and predicting Illinois would adopt it); *Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1578–79 (10th Cir.1984)(applying Pennsylvania law); *Westinghouse Elec. Corp. v. Nielsons, Inc.,* 647 F.Supp. 896 (D.Colo.1986) (applying Colorado law); *Owens–Corning Fiberglas Corp. v. Sonic Dev. Corp.,* 546 F.Supp. 533 (D.Kan.1982) (applying Kansas law); *Armco Steel Corp. v. Isaacson Structural Steel Co.,* 611 P.2d 507, 518 & n. 30 (Ala.1980); *Southern Idaho Pipe & Steel Co. v. Cal–Cut Pipe & Supply, Inc.,* 98 Idaho 495, 567 P.2d 1246, 1254–55 (1977); *Uniroyal, Inc. v. Chambers Gasket & Mfg. Co.,* 177 Ind.App. 508, 380 N.E.2d 571, 578 (1978); *S. C. Gray, Inc. v. Ford Motor Co.,* 92 Mich.App. 789, 286 N.W.2d 34 (1979); *St. Paul Structural Steel Co. v. ABI Contracting, Inc.,* 364 N.W.2d 83 (N.D.1985) (applying Minnesota law); *Richardson,* 790 A.2d at 968 (applying New Jersey law); *Gardner Zemke Co. v. Dunham Bush, Inc.,* 115 N.M. 260, 850 P.2d 319, 325–26 (1993); *Lory Fabrics, Inc. v. Dress Rehearsal, Inc.,* 78 A.D.2d 262, 434 N.Y.S.2d 359, 363 (N.Y.App.Div. 1980); *Superior Boiler Works v. R.J. Sanders, Inc.,* 711 A.2d 628, 635 (R.I.1998); *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.,* 28 Wash.App. 539, 625 P.2d 171 (1981).

■ The Court's task today is to predict how the Pennsylvania Supreme Court would rule if confronted with the issue. *See Travelers Indem. Co. v. DiBartolo,* 131 F.3d 343, 348 (3d Cir.1997). In making this determination, federal courts should examine, if available: "(1) what the Pennsylvania Supreme Court has said in related

areas; (2) the decisional law of the Pennsylvania intermediate courts; (3) federal appeals and district court cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issues we face here." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir.2002).

The Pennsylvania Supreme Court has never addressed the issue. The Court has unearthed only one intermediate court opinion, but it does not directly address the question, contains self-contradictory comments, and does little to aid in prediction. *See United Coal &· Commodities Co. v. Hawley Fuel Coal, Inc.,* 363 Pa.Super. 106, 525 A.2d 741, 743–44 (1987).[6] The court circumnavigated the issue. Therefore, *United Coal* provides little guidance.

I next turn to ·federal courts within Pennsylvania. My colleagues seem to be comfortable with application of the knockout rule, but to date, no one has expressly held it to be the law. One court applied the knockout rule, but did so upon the agreement of the parties. *See Titanium Metals Corp. v. Elkem Mgmt.*, 191 F.R.D. 468, 470 (W.D.Pa.1998)(Smith, J.). Another described the debate in some detail but never specifically adopted a rule. *See Pennsylvania Power & Light Co. v. Joslyn Corp.*, Civ. A. No. 87–2027, 1988 WL 115773, at *3, 1988 U.S. Dist. LEXIS 12073, at *6 (E.D.Pa. Oct. 31, 1988)(Cahn, J.). A third court has expressed a preference for the knockout rule, but it ultimately rested on the ground that the offeror had expressly objected to the offeree's insertion of a different delivery term into the contract, barring the term under Pa. U.C.C. § 2207(b)(3). *See Reaction Molding II*, 588 F.Supp. at 1289.

The Tenth Circuit has predicted that the Pennsylvania Supreme Court would opt

for the knockout rule. *See Daitom*, 741 F.2d at 1578–79. In light of the superior policy reasons behind the knockout rule, its fit with the text of the statute, and the vast majority of jurisdictions adopting it, *I concur with the Tenth Circuit and conclude that the Pennsylvania Supreme Court would adopt the knockout rule.*

### ii. Application of § 2207 to the Exchange of Letters Between Reilly Foam and Rubbermaid

The parties have concluded a contract for the sale of sponges. Both Reilly Foam's proposal and Rubbermaid's response call for the sale of sponges of differing varieties, and they agree on the identification of particular sponges, along with dimensions and prices for each. Rubbermaid also agreed to add $0.015 to price of each sponge until Rubbermaid had made purchases of 2 million sponges to cover Reilly Foam's tooling costs of $30,000.00.

As to annual purchases of "other affected products," the price list accompanying Reilly Foam's March 26 letter set a minimum annual quantity requirement for each type of sponge. Rubbermaid's March 30 response contains no term at odds with that requirement. To the contrary, Mr. Ferrante wrote "approved" on the page. Furthermore, while Mr. Ferrante's letter does not expressly mention "Other Affected Products," Mr. Ferrante did consent to the $0.015 surcharge on the first two million sponges, implying that he accepted an obligation to purchase sponges in the "other affected products" category. As noted above, the March 26, 1999 correspondence sets those numbers at 340,000 for Brown sponges, 350,000 for Yellow Ester with

---

**6.** Neither of the parties cited to United Coal in their briefs. However, the Court feels

compelled to address it.

Wave Pattern sponges, and 300,000 for the Yellow Ether to White Scrubmate sponges.

■ The March 26 and March 30 letters also do not differ with respect to the time period within which Rubbermaid was to purchase two million sponges with a $0.015 surcharge. Reilly Foam sought a two-year time frame, and Rubbermaid omitted that term in its acceptance. Rubbermaid therefore argues the two terms drop out under the knockout rule, giving Rubbermaid an infinite period of time in which to make its purchases. However, Mr. Ferrante's March 30 letter is silent as to the time period within which Rubbermaid had to make its purchases. Thus, the offer and acceptance do not differ and the two-year requirement is part of the contract.[7]

However, as to the requirements contract clause that Reilly Foam sought respecting the butterfly and roller mop sponges, the knockout rule applies. Rubbermaid's acceptance of a requirements contract was limited to Tidal Wave project sponges produced by New Knight on behalf of Rubbermaid for current products listed in Reilly Foam's March 26 letter. The parties agree that New Knight assembled only the butterfly sponge mop; Rubbermaid manufactured the roller mop "in-house." Thus, Rubbermaid's commitment only related to the butterfly sponges. In addition, any new products that New Knight might produce in the future for Rubbermaid would be subject to the same arrangement. However, Rubbermaid did not commit to purchase all of its direct requirements for sponges from Reilly Foam. Therefore, the term creating a requirements contract for all of Rubbermaid's needs for the Tidal Wave brand of sponges falls out of the contract. Rubbermaid did commit to ensuring that its purchases from New Knight are manufactured with Reilly Foam sponges. Both letters agreed on that point. *See Lory Fabrics, Inc.*, 434 N.Y.S.2d at 363 (knocking out those aspects of differing terms which are in conflict and sustaining remainder of provision).[8]

All the evidence shows that Rubbermaid fulfilled its contractual duty to ensure that New Knight dealt exclusively with Reilly Foam. On instructions from Rubbermaid, New Knight made its purchases exclusively from Reilly Foam and never bought sponges for the Tidal Wave project from Tek Pak. (Lalli Dep. at 42–43; 57–58). A Tek Pak representative confirmed this. (Dignazio Dep. at 126). The uncontested evidence shows that New Knight went out of business in August, 2001 when it entered bankruptcy, terminating any continuing obligation that Rubbermaid held.

■ However, the record remains unclear as to whether Rubbermaid satisfied its obligations regarding quantity requirements of butterfly sponges. Rubbermaid

---

7. Reilly Foam seeks partial summary judgment for Rubbermaid's commitment to purchase the "other affected" sponges. The Court agrees, but notes that the parties dispute how many sponges were actually purchased. Reilly Foam presented documents which supposedly represent its document all of its sales to Rubbermaid and New Knight. Rubbermaid claims that the documents do not completely reflect all of its purchases to date. The parties may present evidence on point at trial.

8. At oral argument, Reilly Foam contended the provision respecting New Knight was an additional clause rather than a different one. However, Rubbermaid refused to commit itself to a requirements contract. The term regarding New Knight was a counterpart to Reilly Foam's original proposal for Rubbermaid to commit to an exclusive requirements contract. Rubbermaid's alteration of that proposal certainly qualifies as a "different" term.

provided purchase forecasts to Reilly Foam of its anticipated purchases of butterfly sponges, but its purchases to date do not approach its forecasts. Rubbermaid contends that the Pa.U.C.C. imposes no obligation on it to make the purchases of sponges described in its forecasts.

Generally, the buyer under a requirements contract agrees to purchase all of its requirements for a particular good "as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate … may be … demanded." Pa.U.C.C. § 2306(a). Rubbermaid construes the section to mean that a buyer cannot demand a quantity unreasonably *greater* than estimated, but "there is no indication that the draftsmen [of U.C.C. § 2306] were equally, if at all, concerned about the case where the buyer takes *less* than his estimated requirement." (Rubbermaid Mot. for Summ. Judg. at 16, *quoting Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1338 (7th Cir.1988))(emphasis added).

Rubbermaid fails to fully state the Seventh Circuit's holding. After noting the above rationale, it held: "We conclude that the Illinois courts would allow a buyer to reduce his requirements to zero *if he was acting in good faith*, even though the contract contained an estimate of those requirements." *Empire Gas*, 840 F.2d at 1338 (emphasis added). While it is true that a "seller assumes the risk of all good faith variations in a buyer's requirements even to the extent of a determination to liquidate or discontinue the business," *HML Corp. v. Gen'l Foods Corp.*, 365 F.2d 77, 81 (3d Cir.1966),[9] a buyer purchasing

less than its forecasts may still be found in breach if it acted in bad faith. *Accord* James J. White & Robert S. Summers, Uniform Commercial Code § 3–9 at 141 (5th ed.2000). Professors White and Summers recommend looking at a host of factors to determine bad faith, including whether the buyer is in fact procuring its requirements more cheaply from another source, whether the seller was unable to anticipate the buyer's action, and whether the seller "had even expended significant sums or otherwise relied on promises of the buyer in preparing to meet the buyer's needs." *Id.* at 141–42 (citing *Paramount Lithographic Plate Serv. Inc. v. Hughes Printing Co.*, 2 Pa. D. & C.3d 677, 691, 1977 WL 757 (Ct.Com.Pl.1977)).

Plaintiff has adduced evidence that Rubbermaid's conduct falls squarely within these categories. Reilly Foam contends that Rubbermaid has made purchases from Tek Pak. Rubbermaid also knew that Reilly Foam had expended a large sum of money in order to be in a position to manufacture the specially-ordered sponges. Thus, the Court leaves the determination of Rubbermaid's bad faith to the jury. *See e.g. Paramount Lithographic*, 2 Pa. D. & C.3d at 683, 1977 WL 757 (charging jury on whether parties to requirements contract acted in good faith). Indeed, *HML Corporation*, which Rubbermaid cites, was an appeal following a bench trial and the issue on appeal was the plaintiff seller's failure to prove *at trial* that the defendant buyer acted in bad faith in substantially reducing its requirements. *See. id.* 365 F.2d at 80 & 83.[10] Thus, Reilly Foam may seek damages for Rub-

---

9. Although *HML Corp.* involved pre-U.C.C. New York law, the court also noted that the text and comments to Pa.U.C.C. § 2306 showed that section was not intended to bring about any change in doctrine. *See HML Corp.*, 365 F.2d at 81 n. 5.

10. Reilly Foam, as both seller and plaintiff here, will bear the burden of proving Rubbermaid's bad faith in reducing its requirements. *See Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1124 (3d Cir.1992); *HML Corp.*, 365 F.2d at 83.

bermaid's failure to ensure that New Knight purchased requirements of butterfly sponges from Reilly Foam until New Knight entered bankruptcy.

In summary, Rubbermaid has breached the contract in failing: (1) to make minimum annual purchases of "other affected products" as set forth on the March 26 price list; (2) to purchase two million sponges under the "other affected products" category with a $0.015 surcharge within two years of the contract date. Reilly Foam may also sue for Rubbermaid's alleged failure to make good faith efforts to ensure that New Knight purchased all of its requirements of butterfly mop sponges for Rubbermaid products from Reilly Foam until New Knight went bankrupt in August 2001. Plaintiff must also establish the extent of its damages at trial.

### D. Intentional / Negligent Misrepresentation

Reilly Foam has also brought claims for fraudulent misrepresentation, or in the alternative, negligent misrepresentation. Rubbermaid seeks judgment on these claims because there was no misrepresentation cognizable as a tort and because they are barred under the "economic loss" and "gist of the action" doctrines. Because the Court must grant summary judgment based on the economic loss doctrine, the Court need not reach Rubbermaid's remaining arguments.

■■■ The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir.2002). Tort law does not function to compensate for a "breach of duties assumed only by agreement." *Factory Mkt. v. Schuller Int'l*, 987 F.Supp. 387, 395 (E.D.Pa.1997) (Newcomer, J.).

■■ Plaintiff's negligent misrepresentation claim is quickly dispatched; the economic loss doctrine bars claims for negligent misrepresentation. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 620 (3d Cir.1995); *Factory Mkt.*, 987 F.Supp. at 397 (negligence claim barred by economic loss doctrine); *Sun Co. v. Badger Design & Constructors*, 939 F.Supp. 365, 374 (E.D.Pa.1996) (Padova, J.). A party negotiating with another can insist on contract language that protects it against the other party's "innocent, but wrong" representations. *Duquesne Light*, 66 F.3d at 620. Therefore, Reilly Foam's negligent misrepresentation claim is dismissed.

■■■ The intentional misrepresentation claim presents a more complicated issue. Recently, the Third Circuit held that an intentional misrepresentation claim is barred by the economic loss doctrine in the context of a products liability lawsuit where the representation concerned the character of the goods. *See Werwinski*, 286 F.3d at 674–81. The Court of Appeals found intentional misrepresentation claims are generally preempted by the economic loss rule, but noted an exception in limited instances in which a defendant committed fraud to induce another to enter a contract. However, if the alleged misrepresentation inducing the party to enter the contract concerned the quality or character of goods, the exception does not apply and the economic loss rule bars the misrepresentation claim. *See id.* at 676, 680–81 (citing *Huron Tool & Engineering Co. v. Precision Consulting Servs.*, 209 Mich. App. 365, 532 N.W.2d 541 (1995)). The Court reasoned that the parties were free to negotiate a warranty and other terms to address possible defects in the goods. *See id.* The Court also feared that if every fraudulent inducement claim to survive independently of the contract, then "tort law would swallow contract law." *Id.* at 678.

Inducement claims remain viable only when a party makes a representation extraneous to the contract, but not when the representations concern the subject matter of the contract or the party's performance. *See id.* at 678 (quoting *Rich Prod. Corp. v. Kemutec*, 66 F.Supp.2d 937, 979 (E.D.Wis. 1999)).

 Plaintiff's sole argument that the economic loss doctrine does not apply is that Rubbermaid's statements preceded and were collateral to the contract. In light of *Werwinski*, Reilly Foam cannot avoid application of the doctrine. Reilly Foam's claim is predicated on Rubbermaid's failure to make its requirements purchases exclusively from Reilly Foam; the damages it seeks are for economic benefits to which it was only entitled under the contract. The quantity terms were directly discussed between the parties in a commercial setting, and Reilly Foam could have insisted upon contract terms to protect itself. Its expectation damages are now protected by contract law and not tort law.[11]

### E. Promissory Estoppel and Restitution

 In Counts Five and Six of the Amended Complaint, Reilly Foam sues for promissory estoppel and unjust enrichment. The parties here dispute the terms of the contract; they do not contest that one was formed. Claims of promissory estoppel and restitution are not cognizable where the parties have a contract. *See Carlson v. Arnot–Ogden Mem. Hosp.*, 918 F.2d 411, 416 (3d Cir.1990) (promissory estoppel only invoked "where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise"); *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir.1987) (holding unjust enrichment "inapplicable when the relationship between the parties is founded on a written agreement").

 Reilly Foam urges that these counts be sustained because the contract does not explicitly provide for its recoupment of capital costs for machinery and licensing. However, "[p]romissory estoppel ... is not designed to protect parties who do not adequately memorialize their contracts in writing." *Iversen Baking Co., Inc. v. Weston Foods, Ltd.*, 874 F.Supp. 96, (E.D.Pa.1995). Restitution is similarly unavailable where a contract fixes the amount of compensation due. *See Hershey Foods Corp.*, 828 F.2d at 999. Reilly Foam had a sufficient opportunity to protect its expectations through express contract terms and cannot now rely on consideration substitutes and quasi-contract theory. Counts Five and Six are therefore dismissed.

### IV. RUBBERMAID'S PETITION FOR FEES AND EXPENSES

 Finally, Defendants seek monetary sanctions for Plaintiff's belated pro-

---

11. Plaintiff has not addressed whether the economic loss doctrine is applicable outside the context of warranty actions. Therefore, the Court deems the argument waived. A fuller discussion of the issue can be found in other cases. *See Factory Mkt.*, 987 F.Supp. at 397; *Sun Co.*, 939 F.Supp. at 372–73 (economic loss rule applicable to contract for management services); *Auger v. Stouffer Corp.*, Civ. A. No. 93–2529, 1993 WL 364622, at *5, 1993 U.S. Dist. LEXIS 12719, at *11 (E.D.Pa. Aug.31, 1993) (Weiner, J.) (applica-ble in hotel management context); *Palco Linings, Inc. v. Pavex, Inc.*, 755 F.Supp. 1269, 1272 (M.D.Pa.1990) (applicable to construction contract); *PPG Indus., Inc. v. Sundstrand Corp.*, 681 F.Supp. 287 (W.D.Pa.1988) (installation contract). *But see Public Serv. Enter. Group, Inc. v. Phila. Elec. & Gas Co.*, 722 F.Supp. 184, 211 (D.N.J.1989) ("Pennsylvania law cases have, for the most part, not extended [the economic loss doctrine] out of the warranty context" and labeling *PPG* a warranty case).

duction of a revised economic expert report. Plaintiff's expert report was due March 8, 2002 per Court order. Plaintiff unavailingly contacted chambers to request an extension. Undeterred, Plaintiff produced a revised report by its economic experts on March 20, 2002, which Rubbermaid promptly moved to exclude as untimely. Exclusion is a drastic remedy for untimely production. *See e.g. DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201–02 (3d Cir.1978) (applying four factor test and deeming exclusion of expert evidence on untimeliness grounds to constitute reversible error); *Bowersfield v. Suzuki Motor Corp.,* 151 F.Supp.2d 625, 632 (E.D.Pa.2001) (labeling exclusion of evidence a "drastic sanction" and permitting expert to opine beyond information contained in expert report). I found that Rubbermaid had adequate time to prepare an expert report of its own before trial and permitted it to prepare a report addressing contentions raised in Plaintiff's supplemental expert report. For Plaintiff's wilful violation of the Court's scheduling order, it was required to pay defense costs incurred due to the late report, including those incurred to prepare the Motion to Strike and to produce a second expert report. *See* Fed.R.Civ.P. 16(f) (authorizing sanctions on violator of Rule 16 order including attorney's fees and other orders which court deems "just"). Rubbermaid then submitted a petition for $1,573.00 in legal fees and $5,640.13 in costs.

Having reviewed the defendant's supplemental expert report, the Court finds that the new report is not all that new; it shares the same analysis, contentions and conclusions with the original. Thus, the Court is at a loss for why a veteran financial analyst like Geoffery Osborne spent so much time on it. The Court understands that a defense expert must be meticulous in his review of detail, but such an extravagance should not be taxed to the opposing party. Moreover, I am mindful that the Plaintiff's lapse was not so severe as to require heavy punishment to ensure compliance with future court orders. Rubbermaid had every right to produce a supplemental report of its own and to look to the plaintiff for recompense, but a bill for $7,213.13 bill is too onerous a fine for producing a report twelve days late. Therefore, the bill of costs is reduced, and Plaintiff is taxed $1,573.00 in attorneys fees and $2,500.00 in taxable costs. In accord with Plaintiff's request, the sanctions are stayed pending trial.

## V. CONCLUSION

In summary, Rubbermaid has breached the contract in failing: (1) to make minimum annual purchases of "other affected products" as set forth on the March 26 price list; (2) to purchase two million sponges under the "other affected products" category with a $0.015 surcharge within two years of the contract date. Reilly Foam must prove at trial the extent of its damages. Reilly Foam may also sue for Rubbermaid's alleged failure to make good faith efforts to ensure that New Knight purchased all of its requirements of butterfly mop sponges for Rubbermaid products from Reilly Foam until New Knight went bankrupt in August 2001. The remainder of Plaintiff's contract claims are dismissed. Plaintiff's claims for fraudulent misrepresentation, negligent misrepresentation,. promissory estoppel, and unjust enrichment are dismissed. Plaintiff is ordered to pay sanctions in the amount of $1,573.00 in attorneys fees and $2,500.00 in taxable costs.

An appropriate order follows.

### *ORDER*

**AND NOW**, this day of **May, 2002**, upon consideration of the Parties' Cross-motions for Summary Judgment, Defendant's Motion for Sanctions, and opposition thereto, it is hereby **ORDERED** that:

(1) Plaintiff's Motion for Partial Summary is **GRANTED IN PART**. Rubbermaid has breached the contract in failing: (1) to make minimum annual purchases of "other affected products" as set forth on the March 26 price list; (2) to purchase two million sponges under the "other affected products" category with a $0.015 surcharge within two years of the contract date. Plaintiff must establish the actual number of "other affected products" purchased during the two-year contract period.

(2) Reilly Foam may also sue for Rubbermaid's alleged failure to make good faith efforts to ensure that New Knight purchased all of its requirements of butterfly mop sponges for Rubbermaid products from Reilly Foam until New Knight went bankrupt in August 2001.

(3) Defendant's Motion for Summary Judgment is **GRANTED IN PART**. The Plaintiff's contract claims not discussed in paragraphs one and two of this Order are dismissed. Partial judgment is entered for the Defendant on Count III (Fraudulent Misrepresentation); Count IV (Negligent Misrepresentation); Count V (Detrimental Reliance/Promissory Estoppel); and Count VI (Unjust Enrichment), and those counts of the Complaint are **DISMISSED.**

(4) Defendant's Motion for Sanctions is **GRANTED** as follows: Plaintiff is ordered to pay sanctions to the Defendant in the amount of $1,573.00 in attorneys fees and $2,500.00 in taxable costs. Payment is stayed pending trial.