**VULCAN AUTOMOTIVE EQUIPMENT, LTD.,
Plaintiff,**

v.

**GLOBAL MARINE ENGINE &
PARTS, INC., Defendant.**

**No. 00–568L.**

United States District Court,
D. Rhode Island.

Jan. 15, 2003.

claim of disability discrimination.' " *Foster v. Time Warner Entm't Co., L.P.,* 250 F.3d 1189, 1195 (8th Cir.2001) (citations omitted).

Mark A. Pogue, Edwards & Angell, Providence, RI, for Plaintiff.

Paul Matthew Finstein, Warwick, RI, for Defendant.

### DECISION AND ORDER

LAGUEUX, Senior District Judge.

Plaintiff brought the present breach of contract action against defendant for failure to pay for remanufactured marine engines and parts worth approximately $160,000 which defendant had ordered from plaintiff. At trial, defendant offered several defenses and alleged three counterclaims for damages. First, defendant claimed that plaintiff had breached the exclusive dealing provision of the alleged contract between the parties. The second counterclaim was that plaintiff was guilty of slander, and the third was a claim for interference with its advantageous business relationship with a dealer in the United Kingdom. In addition, defendant claimed that plaintiff had breached certain warranties and sought a set off for such violations. At the conclusion of the bench trial, this Court in a bench decision found for plaintiff on all issues and that plaintiff was owed the sum of $157,120.61 on the complaint.

There are two post-trial matters before the Court. First, this Court must determine how much prejudgment interest should be added to the judgment for plaintiff. Secondly, the Court must determine the date from which the interest should be calculated. Upon further review of the exhibits offered at trial, and after close examination of existing statutes and case law, this Court concludes that plaintiff is owed $157,049.61 plus prejudgment interest at the rate of 18 percent per annum. In addition, the Court further concludes that prejudgment interest should begin to accrue 60 days after plaintiff shipped goods in response to each purchase order placed by defendant.

### I. Background

Vulcan Automotive Equipment, Ltd. ("plaintiff") is a Canadian company located in Vancouver, B.C. that makes and sells remanufactured automotive engines and parts. Global Marine Engine & Parts, Inc. ("defendant"), a Rhode Island corporation, is a wholesale distributor of marine engines and parts under its own name. Plaintiff and defendant began doing business in mid 1999. Defendant placed its first order for engines and parts with plaintiff in August 1999 although the parties had not entered into a formal arrangement at that time. During those initial months, plaintiff served as a backup source of marine engines and parts for defendant, because defendant had other suppliers.

For the next few months, defendant continued to place orders and plaintiff continued to fill them. In November 1999, the parties attempted to enter into a letter agreement in order to formalize their existing business relationship. Plaintiff promised to continue to fill defendant's orders and agreed not to sell directly to any other company engaged in the marine trade. For its part, defendant agreed to keep its account current and in good standing with plaintiff.

During the ensuing months, defendant continued to order engines and parts from plaintiff, and plaintiff continued to fill the orders. Although defendant accepted the goods which plaintiff sent in accordance with defendant's purchase orders, defendant nevertheless often failed to pay for those goods in a timely manner. As a result, defendant's account soon became notably delinquent. It was established at trial that defendant failed to keep its account current for any measurable period during the first six months of the year 2000. As a result of defendant's failure to pay for approximately $160,000 worth of engines and parts, plaintiff ceased filling defendant's orders in July of that year.

At trial, defendant, in defense, asserted that plaintiff had committed breaches of warranty and had failed to make timely deliveries. Defendant argued that plaintiff sold defendant numerous defective goods which breached various warranties thereby entitling defendant to credits or adjustments on its overdue account. Defendant also claimed that plaintiff failed to produce and ship engines within the parties' established time frame. By way of counterclaim, defendant made a claim for damages alleging that plaintiff had violated the letter agreement by engaging in business directly with the British company, Keypart, a customer of defendant. Defendant also claimed that plaintiff slandered defen-

dant to Keypart and intentionally disrupted defendant's business relationship with that company.

At the conclusion of the trial, as previously indicated, this Court found for plaintiff on all issues and determined that it was owed $157,120.61 plus prejudgment interest. The purchase orders submitted by defendant to plaintiff and the invoices which accompanied the goods plaintiff shipped to defendant proved that the invoices remained largely unpaid. During the course of the trial, plaintiff submitted a summary of the invoice numbers and the amounts owing. This writer found the summary to be credible and largely accurate based on the underlying documents which were also admitted into evidence. In fact, only the last invoice listed in the summary had been improperly included. That invoice was not based on a purchase order from defendant. Rather, the goods were delivered directly to Keypart, because that company had insisted it needed a replacement engine, and defendant was not available to fill that order. Plaintiff sent the engine to Keypart directly, but sent the invoice to defendant, because plaintiff mistakenly believed that plaintiff was permitted to deal with Keypart only through defendant on account of the parties' letter agreement.

Indeed, beginning on November 10, 1999, both parties labored under the mistaken belief that the letter agreement signed on that date was a valid binding contract. It was not. Simply put, this Court held that there was no mutuality of obligation as required by Rhode Island law. *See Lamoureux v. Burrillville Racing Ass'n,* 91 R.I. 94, 161 A.2d 213, 215 (1960).

As was previously discussed, the letter agreement at first blush appeared to indicate that two promises had been exchanged. It appeared that plaintiff prom-

ised to supply marine engines and parts only to defendant and that defendant in turn promised to keep its account with plaintiff in good standing. These "promises," however, did not create a legally enforceable contract. Indeed, it is evident to this writer that the November 1999 letter was nothing more than an illusory contract, because defendant never promised to buy *anything* from plaintiff. Defendant could have decided not to do business with plaintiff at any time, and plaintiff would have had no claim for breach of contract. At trial, defendant attempted to characterize the letter agreement as a requirements contract by claiming that defendant had promised to purchase all of its engines and parts from plaintiff, but nothing in the letter itself indicated this to be the case. Consequently, the November 10, 1999 letter did not create an enforceable contract.

Thus, this Court found that plaintiff was entitled to recover damages in this case, because defendant breached the numerous individual contracts of sale by refusing to pay the full amount listed on each individual invoice. An offer to create a new purchase and sales contract was made every time defendant sent plaintiff a purchase order. When delivery was made with the accompanying invoice in tow, the contract for sale was consummated, and defendant became obligated to pay for the goods supplied.

Nevertheless, at trial, defendant claimed that plaintiff had breached its contract with defendant. As was discussed above, however, there was no contract to breach, because the letter agreement dated November 10, 1999 was not an enforceable contract. Thus, plaintiff could not have breached any overarching contract for failure to deliver the goods on time nor for failure to fill any orders in violation of an alleged exclusive dealing clause.

Likewise, this Court held that defendant's counterclaim for interference with an advantageous business relationship failed for lack of proof. In order to have found for defendant on this counterclaim, defendant needed to prove that a business relationship was in existence between defendant and Keypart at the time the alleged interference took place. Secondly, defendant needed to establish that plaintiff knew defendant had a relationship with Keypart and that plaintiff intentionally interfered with that relationship. Indeed, defendant was required to prove that the interference caused the harm alleged and likewise was required to offer proof of damages. Defendant was required to show legal malice, that is, an intent to do harm without justification. Defendant was also required to prove that its relationship with Keypart would have continued but for plaintiff's interference. At trial, however, the evidence was clear that when Keypart sought to do business with plaintiff directly, Keypart had already terminated any business relationship it had previously maintained with defendant. Thus, there was a complete lack of proof that the prior relationship between Keypart and defendant would have continued but for plaintiff's actions.

As for the last counterclaim, this Court concluded that there was no substance to defendant's claim for slander. The only alleged slanderous statement involved plaintiff informing Keypart that plaintiff was no longer doing business with defendant, because defendant was not paying its bills. That statement was entirely true. Under the law of slander, defendant must prove falsity. Thus, since the statement was true, defendant's claim for slander failed as well.

As for defendant's defenses, this Court concluded that it was not clear what, if any, warranty had been extended to defen-

dant. Furthermore, defendant showed no legitimate set offs to the amount due and owing. Thus, it was evident at trial that defendant did not pay for most of the goods listed on plaintiff's invoices and that the defenses and counterclaims offered by defendant did not support an adjustment of defendant's overdue account.

Thereafter, on July 26, 2002, this Court issued its decision from the bench for plaintiff in the amount of $157,120.61 plus prejudgment interest. This Court then requested post trial memoranda discussing the issue of how much prejudgment interest was to be included in the judgment and the date from which the interest should be calculated. The parties have submitted memoranda and the matter is now in order for decision.

## II. Discussion

This Court must note at the outset of the discussion that the damage award in the amount of $157,120.61 which this writer granted to plaintiff at trial is incorrect. This Court relied on plaintiff's Exhibit 12 in reaching that figure. That exhibit, however, contains an arithmetic error, and thus the damage award must be adjusted accordingly.[1] Consequently, plaintiff is entitled to damages in the amount of $157,049.61 plus prejudgment interest.

With the damage award having been properly adjusted, this Court now turns to the two issues before it. First, this Court must determine whether the applicable rate of prejudgment interest is 18 percent per year as indicated on plaintiff's invoices or whether the Rhode Island statutory rate of 12 percent per year applies. Second, the dates from which prejudgment interest should be calculated must be ascertained. It is to the first of these two issues that this Court now turns.

### A. Rate of Prejudgment Interest

██ Two proposed interest rates are before this Court. Plaintiff claims that the applicable rate of interest is 18 percent per year, because each invoice which plaintiff issued to defendant expressly stated that a 1.5 percent per month service charge would be applied to overdue accounts. See Pl. Post Trial Mem. at 1. Plaintiff asserts that the 1.5 percent service charge clause on each invoice conforms with the requirements of R.I. Gen. Laws § 6A–2–207 (2001) which governs the incorporation of additional terms to a contract and as such should be incorporated into the sales contract. See id. at 2.

Defendant, however, argues that the 1.5 percent service charge clause does not conform to the requisite statutory requirements, because by ignoring the service charge provision, defendant did not manifest its acceptance of the clause in question. See Def. Post Trial Mem. at 3. Consequently, defendant asserts that in the absence of an otherwise provided for contractual interest rate, Rhode Island law requires the application of a 12 percent statutory rate of interest to a decision awarding money damages. See id. at 2, 5.

In order to determine the amount of interest owed plaintiff, this Court must apply the laws of the State of Rhode Is-

1. In issuing its decision from the bench, this Court relied on the calculations made in plaintiff's Exhibit 12. This Court determined that the last invoice on the exhibit which was dated September 25, 2000, should not be included in the damage award and consequently subtracted $1747.00 from $158,867.61 thereby arriving at a judgment of $157,120.61. Plaintiff, however, failed to note that the sum due on the invoices issued between September 1, 1999 and March 13, 2000 is $173.50 and not $244.50. Consequently, the judgment handed down from the bench must be decreased by seventy-one dollars.

land, because this case arises under federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 (2000). *See Fratus v. Republic Western Ins. Co.*, 147 F.3d 25, 30 (1st Cir.1998). Therefore, this Court must examine the Uniform Commercial Code as adopted by Rhode Island in order to determine whether the 18 percent service charge clause on plaintiff's invoices was incorporated into each sales contract as an additional term. If the 1.5 percent service charge is an additional term, then the statutory rate does not apply. The relevant U.C.C. provision at issue is § 6A–2–207(2) (2001). This section states:

> The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) The offer expressly limits acceptance to the terms of the offer; (b) They materially alter it; or (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

*Id.*[2] With regard to subsection (a), an express limitation provides a contracting party with "unambiguous notice" that the acceptance of an offer is limited to the terms of that offer. *JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 53 (1st Cir. 1999). In the present case, neither defendant's purchase orders nor any additional evidence offered at trial indicated that defendant unambiguously notified plaintiff that plaintiff's ability to accept the purchase orders was expressly limited to the terms of those orders. Since there was no unambiguous notification of an express limitation, subsection (a) does not preclude the incorporation of the 1.5 percent service charge on plaintiff's invoices.

Subsection (b), which prohibits the incorporation of terms which materially alter a contract, likewise does not prevent incorporation in this case. One of the purposes of prohibiting the incorporation of terms which materially alter a contract is to protect a party, which does not have any express awareness of the additional terms, from surprise and undue hardship. *See* § 6A–2–207(2)(b) cmt. 4.[3] While Comment 4 lists clauses which would materially alter a contract, Comment 5 of the statute clearly explains that there exist additional terms which do not involve any element of unreasonable surprise. *See id.* cmt. 4–5. Comment 5 explicitly states that these types of clauses should be incorporated into the contract provided no seasonable objection has been given. *Id.* One such clause that warrants incorporation according to Comment 5 is "a clause providing for interest on overdue invoices." *Id.* Thus, the commentary itself encourages the incorporation of the 1.5 percent interest charge in this case.

Furthermore, Rhode Island case law has adopted this position. *See Tim Hennigan Co., Inc. v. Anthony A. Nunes, Inc.*, 437 A.2d 1355, 1357 (R.I.1981). In that case, Tim Hennigan Co. brought suit for goods sold and delivered to Anthony A. Nunes, Inc. *Id.* at 1355. Nunes initiated the transactions by mailing two purchase or-

---

**2.** A merchant is defined as:

A person who deals in goods of the kind or otherwise by his or her occupation holds him or herself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or broker or other intermediary who by his or her occu-

pation holds him or herself out as having such knowledge or skill.

R.I. Gen. Laws § 6A–2–104 (2001). It is undisputed that both parties in this case are merchants within the meaning of this section.

**3.** While Official Comments to the Uniform Commercial Code do not have the force of law, they are helpful in interpreting the statutory text. *See JOM*, 193 F.3d at 57 n. 6.

ders to Hennigan, and Hennigan in turn sent invoices to Nunes expressly stating that Hennigan would charge Nunes an 18 percent carrying charge on any overdue accounts. *Id.* at 1356. Nunes appealed the trial court's ruling that the 18 percent charge was incorporated into the contract. *Id.* at 1357. The Rhode Island Supreme Court agreed with the trial court and held that the interest term on the invoices was incorporated into the contract in accordance with § 6A–2–207. *Id.* Indeed, this appears to be the majority rule as a number of circuits have reached the same conclusion. *See, e.g., Northrop Corp. v. Litronic Indus.,* 29 F.3d 1173, 1175 (7th Cir. 1994); *American Ins. Co. v. El Paso Pipe and Supply Co.,* 978 F.2d 1185, 1190 (10th Cir.1992); *Mid–South Packers, Inc. v. Shoney's Inc.,* 761 F.2d 1117, 1123 (5th Cir.1985); *but see Graham Paper Co. v. Schottco Corp.,* 555 F.2d 193, 197 (8th Cir. 1977) (explaining that a one percent service charge written in small print on plaintiff's acknowledgment form did not become part of the contract, but that plaintiff was entitled to the Missouri statutory interest rate of six percent). Therefore, in light of Comment 5 and the case law adopting that commentary, the 1.5 percent service charge on each invoice appears to be the governing interest provision in this case.

Furthermore, Comment 6 of § 6A–2–207 also favors the incorporation of the 1.5 percent service charge. Comment 6 addresses the question of notification under subsection (c) of the statute. The relevant portion of Comment 6 states, "[i]f no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to." *Id.* At trial, plaintiff introduced its invoices into evidence. A pre-printed statement appears on each of those invoices stating that a service charge of 1.5 percent per month would be assessed on

overdue accounts. *See, e.g.,* Pl.'s Ex. 6. Nevertheless, defendant asserts that by ignoring the 1.5 percent interest term when defendant tendered payment, defendant manifested its rejection of that term. Def. Post Trial Mem. at 4. In support of its position, defendant relies on *F.D. McKendall Lumber Co. v. Kalian,* 425 A.2d 515, 518 (R.I.1981) in which the Rhode Island Supreme Court noted that a party who signs a delivery receipt "manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." This writer agrees with this common sense proposition, but disagrees with defendant's extrapolation that a party, therefore, must affirmatively assent to the addition of an interest term before the term is incorporated into a contract. *See* Def. Post Trial Mem. at 3. Indeed, defendant's position directly contradicts the statutory explanation provided by Comment 6, because the first sentence of that Comment indicates that by ignoring a non conflicting additional term, a merchant manifests *acceptance* of that additional term. *See* § 6A–2–207 cmt. 6.

Just as the language of Comment 6 explains that a party to a contract must affirmatively act in order to manifest the party's objection to any proposed additional terms, so too does the case law indicate that § 6A–2–207 requires more than a party's passive disavowal of the proposed terms. *See, e.g., Rangen, Inc. v. Valley Trout Farms, Inc.,* 104 Idaho 284, 658 P.2d 955, 964 (1983) (explaining that cases dealing with the issue have ordinarily involved written notice). This Court need not determine whether an objecting party must provide written notification or whether oral notification suffices to satisfy the requirement of § 6A–2–207(2)(c), because it is evident that defendant in this case did not provide plaintiff with *any* notice of

objection. Consequently, the first part of Comment 6 indicates that the 18 percent service charge should be incorporated into the contract.

Thus, in light of the statutory requirements set forth in § 6A–2–207 and the applicable commentary, the proper interest rate in this case is 18 percent, and not the Rhode Island statutory rate of 12 percent.

B. The Date from which Interest is Calculated.

■ While the commentary to § 6A–2–207 and its accompanying case law point to 18 percent as the applicable rate of interest in this case, it is less clear from what date the prejudgment interest should be calculated. The evidence at trial established that the payment term "Net 20th proximo" on plaintiff's invoices refers to the 20th day of the next month. This means that depending on when the goods and invoices were sent, defendant would have anywhere from 20 to 50 days to remit payment.[4] Defendant's purchase orders, on the other hand, provided that defendant would have 30 days to pay for orders placed between August 1999 and November 1999 and 60 days to pay for the remainder of the orders. Although these payment terms do not differ dramatically to the extent that payment would be due under both the invoices and the purchase orders within the same general time period, both sets of terms do not consistently provide for the same precise due date. Indeed this Court needs a definitive date in order to calculate the amount of prejudgment interest due plaintiff, and thus

must turn to the U.C.C. and existing case law to resolve this issue.

The difficulty in ascertaining a concrete date, however, is attributable to the convoluted world of the Uniform Commercial Code. While the commentary and accompanying case law that discusses the incorporation of interest clauses on invoices clearly leads in one direction, the same is not true when there is a question regarding conflicting terms. Rhode Island's U.C.C. does not specifically address what should be done in this case. That is, the U.C.C. provisions do not explain what terms constitute a contract when a written offer and a written acceptance contain conflicting terms. In fact, only Comment 6 speaks to the problem, and the Comment itself is confusing on the issue. *See* Ronald A. Anderson, *Anderson on the Uniform Commercial Code,* § 2–207:108 at 617 (1997). Comment 6 provides in relevant part:

> Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract.

§ 6A–2–207 cmt. 6. The difficulty with the Official Comment is that it addresses conflicting clauses on *confirming forms* which has been interpreted to mean "merchant confirmations of a prior oral agreement." *Superior Boiler Works, Inc. v. R.J. Sanders, Inc.,* 711 A.2d 628, 635 n. 8 (R.I.1998). William Hawkland has explained that the very definition of "confirmation" presupposes that a contract has already been

---

**4.** Defendant would have 20 days to pay for the goods if the invoice and goods were sent on the last day of the month. On the other hand, defendant would have 50 days to pay for the goods if the invoice and goods were

sent on the first day of the month. Thus, depending on when the invoice and goods were sent, defendant would have between 20 and 50 days to pay for the goods.

made. William D. Hawkland, *Hawkland U.C.C. Series* § 2–207:5 (Art 2) (2001). Hawkland argues that the confirmation language in § 6A–2–207(1) and Comment 6 actually means "validation," and therefore, this part of the Code only applies when the parties must satisfy the Statute of Frauds due to a previously formed oral agreement. *Id.* According to Hawkland, Comment 6 indicates that a written confirmation satisfies the Statute of Frauds if the confirming forms are sent within a reasonable time after the parties entered into the oral agreement. *Id.* Thus, the Rhode Island Supreme Court in *Superior Boiler Works* concluded that the language of Comment 6 does not provide sufficient guidance in determining how to reconcile conflicting terms on invoices and purchase orders where a prior oral agreement does not exist. *See* 711 A.2d at 635 n. 8.

Indeed, the circuits themselves are divided on how to interpret Comment 6. The Tenth Circuit in *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1578–1579 (10th Cir. 1984) explained that there are three approaches which can be used to address the problem of different, as opposed to additional, terms under § 2–207(2). That Court explained that the first option is to treat "different" terms the same as "additional" terms under § 2–207(2). *Id.* at 1579. The different terms, therefore, would never become part of the contract under § 2–207(2)(b), because they would always materially alter the contract as formed by the offeror's terms. *Id.* The second approach adopts Hawkland's position. This approach reads § 2–207(2) and Comment 6 literally thereby concluding that subsection (2) and the first sentence of Comment 6 do not apply to "different terms" since *only* "additional terms" are mentioned. *Id.* Furthermore, as was discussed above, the remaining portion of Comment 6 does not apply, because conflicting or "different terms" must be pres-

ent on confirming forms which indicates the presence of a prior oral agreement. *Id. See also* Hawkland, § 2–207:5.

The third option, called the "knock out" rule, is the preferable approach according to the Tenth Circuit and the Rhode Island Supreme Court. *See Daitom*, 741 F.2d at 1579; *Superior Boiler Works*, 711 A.2d at 635. Under this approach, conflicting terms are not incorporated into the contract, and the offeree's invoice is treated only as an acceptance of the terms in the offeror's purchase order which do not conflict. *See Daitom*, 741 F.2d at 1579. The conflicting terms essentially cancel each other which consequently leaves a blank in the contract to be filled with a U.C.C. "gap-filler" provision. *Superior Boiler Works*, 711 A.2d at 635. The Tenth Circuit in *Daitom* stated that Comment 6 itself supports this approach to at least a limited extent, since it discusses a "knock out" rule for conflicting terms in confirming forms even though it does not discuss how conflicting terms should be treated when those forms are simply purchase orders and invoices. 741 F.2d at 1579.

Nevertheless, not all courts have concluded that Comment 6 only applies to confirming forms of a prior oral agreement. *See, e.g., Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F.Supp.2d 643, 654 (E.D.Pa.2002) ("Advocates of the knockout rule interpret Comment 6 to require the cancellation of terms in both parties' documents that conflict with one another, *whether the terms are in confirmation notices or in the offer and acceptance themselves.*") (Emphasis added.) The First Circuit discussed the issue of conflicting purchase orders and acknowledgment forms in *Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184 (1st Cir.1997), and treated them the same as confirming forms under Comment 6. That court ap-

plied the Massachusetts version [5] of § 2–207 and its accompanying Comment 6 and concluded that "where the terms in two forms are contradictory, each party is assumed to object to the other party's conflicting clause." *Id.* at 189. Although *Ionics* involved an acknowledgment form and not an invoice per se, the form in *Ionics* was comparable to an invoice, because rather than confirming a prior oral agreement, the acknowledgment form served as an acceptance of the purchase order, much like plaintiff's invoices in the present case. Thus, although the forms in *Ionics* were not confirmation forms, and although there was no indication that the parties had formed a prior oral agreement, the First Circuit nevertheless applied § 2–207 and Comment 6 to that case.

The difficulty with § 2–207, however, primarily lies with the statutory analysis and not the ultimate outcome in any given case. While courts may disagree about whether the application of Comment 6 is limited to forms which confirm a prior oral agreement or whether the language of that Comment can be stretched to include purchase orders and invoices as well, at the end of the day, the clear majority position is to apply the "knock out" rule to conflicting terms. *See, e.g., Superior Boiler Works,* 711 A.2d at 635; *Reilly,* 206 F.Supp.2d at 654; *Westinghouse Elec. Corp. v. Nielsons, Inc.,* 647 F.Supp. 896, 901 (D.Colo.1986) (applying Colorado law); *St. Paul Structural Steel Co. v. ABI Contracting, Inc.,* 364 N.W.2d 83, 86 (N.D. 1985) (applying Minnesota law); *Owens–Corning Fiberglas Corp. v. Sonic Dev. Corp.,* 546 F.Supp. 533 (D.Kan.1982) (applying Kansas law). Consequently, the terms to which both parties have agreed

become the contract, and the U.C.C. provisions act as gap-fillers. Yet the rationale for why those terms should not be incorporated into the contract is clearly still open to debate.

Nevertheless, since this Court is sitting in diversity, this writer must apply the substantive law of Rhode Island as interpreted by the Rhode Island Supreme Court in order to determine how much prejudgment interest should be awarded to plaintiff. *See Fratus,* 147 F.3d at 30. Therefore, this Court must utilize the "knock out" rule as adopted by the Rhode Island Supreme Court in order to determine the appropriate due date under the parties' contracts. *See Superior Boiler Works,* 711 A.2d at 635 (concluding that "both prudence and the weight of authority favor adoption of the knock-out rule as the law of this jurisdiction"). Since this Court concludes that the due date provisions on the respective purchase orders and invoices conflict, those provisions should not be incorporated into the contract.

This Court consequently must turn to the U.C.C. and its gap-filler provisions in order to fill in the missing payment due date. The relevant U.C.C. provision is R.I. Gen. Laws § 6A–2–309 (2001). Section 6A–2–309(1) specifically states that "the time for shipment or delivery or *any other action under a contract* if not provided in this chapter or agreed upon shall be a *reasonable time." Id.* (emphasis added). The Official Comment to subsection (1) explains that a reasonable time depends upon the circumstances surrounding the contractual relationship.[6] This Court,

---

5. The Massachusetts version of the U.C.C. § 2–207 is identical to § 6A–2–207 of the Rhode Island General Laws.

6. Official Comment 1 to § 6A–2–309(1) explains that a reasonable time "depends upon what constitutes acceptable commercial conduct in view of the nature, purpose and circumstances of the action to be taken. Agree-

therefore, finds that a reasonable time for payment in this case is sixty days.

As was discussed above, the "Net 20th proximo" language on plaintiff's invoices creates a due date period ranging from 20 to 50 days. This substantial variance does little to aid this Court in assessing a concrete due date for each individual contract that was formed. Consequently, this Court looks to defendant's proposed due dates for guidance. Although the initial purchase orders required payment within 30 days, this Court concludes that those purchase orders were issued during what was essentially a trial period for the parties. From August 1999 through November 1999, the parties began to develop a commercial relationship but did not cement that relationship until November 10, 1999. Although the November 10, 1999 letter did not establish an enforceable contractual relationship per se, the parties relied on the letter as if a contract had in fact been formed. Since the payment term became 60 days on defendant's purchase orders after November 10, 1999, defendant clearly expected that it would remit payment to plaintiff within that time frame as a result of the parties' letter agreement. It is reasonable to conclude, therefore, that had the parties attempted to enter into a written contract in August 1999, defendant probably would have insisted on a payment period of 60 days at the outset. Consequently, since the 60 day requirement on the purchase orders appears to have been defendant's favored time period during which to remit payment, and in light of plaintiff's widely varying "Net 20th proximo" term, this Court finds that 60 days is a reasonable and consistent term to incorporate into each purchase and sales contract bearing in mind that defendant was purchasing for resale and needed time to be paid by the ultimate purchaser.

### III. Conclusion

For the aforementioned reasons, plaintiff is entitled to damages in the amount of $157,049.61 plus prejudgment interest at the rate of 18 percent per annum. Prejudgment interest shall be calculated on each sum due 60 days from the date of each invoice. The calculation is attached as Appendix A. The Clerk shall enter judgment for plaintiff on the complaint for $157,049.61 plus prejudgment interest of $70,805 for a total of $227,854.61.

The Clerk shall also enter judgment for plaintiff on defendant's counterclaims.

It is so ordered.

### APPENDIX A

| Date of Invoice | Due Date 60 Days After Invoice | Amount Due | Prejudgment Interest at Rate of 18% per annum | Total = Amount Due + Prejudgment Interest |
|---|---|---|---|---|
| March 31, 2000 | May 30, 2000 | $ 7,114.00 [7] | $ 3,844.00 [8] | $ 10,958.00 |

ment as to a definite time ... may be found in a term implied from the contractual circumstances, usage of trade or course of dealing or performance as well as in an express term."

7. This figure represents the total amount owing on plaintiff's invoices dated September 1, 1999 to March 31, 2000. *See* Pl's. Ex. 12.

8. Each amount in this column was derived in the following manner:
($7,114.00 × 18%) / 365 days = $4.00 per day
$4.00 per day × 961 days = **$ 3844.00**
961 days is the number of days between the date in Column 2 ("60 Days After Contract Breach") and January 15, 2003, the judgement date.

| | | | | |
|---|---|---|---|---|
| April 6, 2000 | June 5, 2000 | $ 2,390.00 | $ 955.00 | $ 3,345.00 |
| April 20, 2000 | June 19, 2000 | $ 19,061.14 | $ 8,469.00 | $ 27,530.14 |
| May 10, 2000 | July 9, 2000 | $ 50,156.20 | $23,025.00 | $ 73,181.20 |
| May 17, 2000 | July 16, 2000 | $ 7,717.14 | $ 3,656.00 | $ 11,373.14 |
| June 2, 2000 | August 1, 2000 | $ 21,117.39 | $ 8,980.00 | $ 30,097.39 |
| June 12, 2000 | August 11, 2000 | $ 8,400.00 | $ 3,552.00 | $ 11,952.00 |
| June 16, 2000 | August 15, 2000 | $ 21,812.74 | $ 9,724.00 | $ 31,536.74 |
| July 10, 2000 | Sept. 8, 2000 | $ 19,281.00 | $ 8,600.00 | $ 27,881.00 |
| **Total** | | $157,049.61 | $70,805.00 | $227,854.61 |